Eddie Lee **MILLER,** Petitioner,

v.

**A.L. LOCKHART,** Director, Arkansas Department of Correction, Respondent.

No. PB–C–81–152.

United States District Court, E.D. Arkansas, Pine Bluff Division.

Aug. 16, 1994.

---

E. Alvin Schay, Arkansas Death Penalty Resource Center, Inc., Ray E. Hartenstein, Little Rock, AR, for petitioner.

Kelly K. Hill and Jack Ward Gillean, Atty. General's Office, Little Rock, AR, for respondent.

## *AMENDED MEMORANDUM OPINION AND ORDER*

GEORGE HOWARD, Jr., District Judge.

On March 20, 1979, Eddie Lee Miller, an African–American male, was convicted by a Crittenden County, Arkansas, jury of capital felony murder in connection with the robbery and killing of W.F. Bolin, a white male, on November 3, 1978. Miller was sentenced to death by electrocution. On May 4, 1981, Miller filed a petition for writ of habeas corpus raising fourteen separate grounds for relief.

After carefully considering Miller's claims, this Court is persuaded that both the conviction and sentence are invalid for the following reasons which are discussed hereinafter:

1. During closing argument before Miller's jury, the prosecuting attorney improperly argued, among other prejudicial expressions, that Miller is a mad dog and a penalty less than death poses a threat to the jury.

2. The majority opinion of the Arkansas Supreme Court, in affirming the jury's verdict imposing the death penalty, employed a lesser standard than the standard applied in prior Arkansas Supreme Court cases, involving the death penalty, in reviewing the sufficiency of the evidence warranting the death penalty.

3. Miller has established that the prosecuting attorney in his case had a history of consistently and systematically excluding African–Americans as jurors through the use of peremptory challenges which decimated African–Americans as potential jurors. Dr. Robert M. Berry, Miller's expert witness, concluded that the decimation of African–Americans as potential jurors could not be explained as a result of random selection. Respondent offered no evidence to refute or rebut Miller's claim.

4. The trial court in requiring the jury to unanimously find mitigating circumstances deprived Miller of his Eighth and Fourteenth Amendment rights.

## FACTUAL AND PROCEDURAL BACKGROUND

On the morning of November 3, 1978, Miller entered the vacuum cleaner and sewing machine sales and repair shop of W.F. Bolin in Blytheville, Arkansas. Bolin was alone. Miller consumed approximately ten minutes viewing and inspecting merchandise and disclosing information for a credit application just before robbing and killing Bolin by discharging four shots from a .38 caliber pistol. Miller seized a cash box which contained approximately fifty-five dollars.

Jim Hudson, who operates a barber shop adjacent to Bolin's store, heard the shots and verbal expressions "no, no" and recognized the voice as that of Bolin. Hudson decided to enter Bolin's store from a side entrance in order to determine what was taking place and offer assistance. As Hudson pushed open the door to enter, Hudson faced Miller who had both hands on the metal cash box in

front of Hudson with "fingers on the bottom, thumbs on the top." Miller told Hudson "You get in here." But Hudson, instead, backed out of the door and stationed himself between the front door entrance to Bolin's store and the side door entrance he had just exited. Miller exited the side door and fled in the opposite direction from Hudson's position to a back alley and "[placing] the gun in front, apparently in his belt or his clothes. And then he [ran]." Hudson immediately reported the incident to the Blytheville Police Department and gave a description of Miller and described the clothing he was wearing.

During the afternoon of November 3, 1978, Blytheville Police officers, after being satisfied that Eddie Lee Miller was the person being sought, obtained an arrest warrant for Miller as well as a search warrant for Miller's personal residence. Miller was later charged by felony information with the crime of capital felony murder and was convicted on March 20, 1979.

Miller appealed his conviction and sentence to the Arkansas Supreme Court. The Arkansas Supreme Court affirmed the conviction. However, three justices of the seven judges, including the Chief Justice, dissented. Chief Justice Fogleman was of the opinion that the evidence was not sufficient to support a finding that Miller knowingly created a great risk of death to a person other than the victim; and that a jury could not have found this circumstance to exist without gross speculation. In a separate dissenting opinion in which Justice Mays joined, Justice Purtle was of the view that the evidence was deficient not only from the standpoint of knowingly creating a great risk of death to a person other than the victim, but equally as well that Miller did, beyond a reasonable doubt, commit the capital felony murder for the purpose of avoiding or preventing an arrest or effecting an escape from custody. *Miller v. State,* 269 Ark. 341, 605 S.W.2d 430 (1980).

The United States Supreme Court denied Miller's petition for writ of certiorari on March 30, 1981, with two justices dissenting.

*Miller v. State,* 450 U.S. 1035, 101 S.Ct. 1750, 68 L.Ed.2d 232 (1981).

On April 20, 1981, Miller's execution date was set for May 20, 1981. A stay of execution from the Arkansas Supreme Court was sought on April 24, 1981, so that Miller could seek post-conviction relief from that court under its Criminal Procedure Rule 37. The application was denied by the Arkansas Supreme Court without an opinion on May 4, 1981, with one justice willing to grant the stay. On May 4, 1981, Miller filed an application for a stay of execution with this Court along with a petition for a writ of habeas corpus under 28 U.S.C. § 2254. On May 11, 1981, following a hearing on May 8, 1981, this Court stayed Miller's execution until further order of the Court in order to permit Miller to pursue post-conviction relief with the Arkansas Supreme Court.

On September 28, 1981, the Arkansas Supreme Court denied Miller permission to seek post-conviction relief pursuant to Rule 37, Arkansas Rules of Criminal Procedure. *Miller v. State,* 273 Ark. 508, 621 S.W.2d 482 (1981).

On April 7, 1989, Miller filed his second amended petition for writ of habeas corpus in an effort to reflect the issues relied upon in view of changes in the law since the filing of his initial petition.[1] An evidentiary hearing was conducted by the Court on March 13, 14, and 15, 1991. However, the record remained open to allow the parties to proffer additional evidence, if desired.

## DISCUSSION

### I.

Miller asserts that he was denied due process of law and rights secured under the Eighth Amendment by the prosecuting attorney's improper and prejudicial remarks during closing argument at the sentencing phase of his trial. The remarks complained of, argues Miller, introduced factors that are wholly unrelated to the blameworthiness of Miller, thus, created the risk that the death

---

1. The delay between the exhaustion of state remedies and the filing of the second amended petition was by agreement of the parties pending decisions by the Supreme Court on cases involving the Arkansas death penalty.

sentence imposed was based on matters irrelevant to the sentencing process; impaired and prejudiced rights secured to Miller, i.e., right against compulsory self-incrimination; and minimized the jury's understanding and acceptance of the importance of its role in determining whether the death penalty was the appropriate punishment. The following constitute the expressions complained of in the order in which they occurred:

1. None of the members of the Bolin family have taken the stand because I think that you can see that what they would ask of you would not be proper. But I think that you know what their presence here is asking you to do. I think that you need to consider their wishes. That is one of the things you need to consider. I think you know what their wishes are without them taking the stand. (T. 884)

2. Now, Eddie Lee Miller is 27 years old. You won't have but two alternatives, life without parole or death by electrocution. He is 27 years old. I have no idea what his life expectancy may be. Your guess would certainly be as good or better than mine. Let's say close to 70. We are talking about 40 years, approximately in the neighborhood of 40 years or better, a little more or less in the penitentiary. I don't know that you would be doing him any favor there. I know that you are not doing the taxpayers any favor there. This is a tremendous burden also to put on the taxpayers to keep a man roughly 40 years, to provide food, clothing, shelter and guards. The cost of food, clothing, shelter and guards for a little more or a little less than 40 years, what do you think that is going to cost the State of Arkansas, you, you, you, the taxpayers, the people? What do you think the cost of that will be? Can you run it around in your head? (T. 886, 887).

3. Now, I think it would be quite simple at this stage of your deliberation when you go back to reach some type of what could be considered a compromise, that life without parole is a very serious strong penalty. I think that would be a compromise. I don't think that any one of you twelve people sitting there feel that would be proper. I think it would be a compromise. (T. 887).

4. Now, we have got him sitting over here. Today his head is down. His head wasn't down yesterday. He wants to argue. Has he expressed to you any regret for this act? Has he said I am sorry? Has he shown any remorse whatsoever to you? He has simply denied doing it. You know that he lied about that because you said he did. You found him guilty. Of course, the day after he was arrested, when he realized that he was caught he begged for a little mercy, or I would like to get back out on the street. I don't remember. I don't remember.... (T. 888).

Has he expressed any regrets to you, any remorse for putting to death execution style this 51 year old man? Has he even said to you I am sorry I did it? No. I think that you have got to assume that he is not sorry, that he did it. If he was sorry that he did it, he would tell you that he is sorry he did it. He hasn't even said I am sorry. He said I didn't do it when the evidence was so overwhelming that no reasonable person could make any argument as to whether or not the man was guilty. He just simply said I didn't do it. (T. 888, 889).

Mr. Bolin begged for mercy. Mr. Bolin begged for mercy. Eddie Lee Miller hasn't begged for any mercy but Mr. Bolin did.... Does this man deserve mercy? Is this the man that you good people feel that you owe mercy to who doesn't even ask you for it? Doesn't even level with you at this stage and say that I am sorry that I killed Mr. Bolin? Doesn't even come up here today at this stage and tell you that I am sorry. (T. 889, 890).

5. Now, I told you yesterday that I have been practicing law for about 20 years and in that practice I have seen a lot of criminals and a lot of people. I have never seen me one that was as tough, a man that will sit right up there on that witness stand and look you 12 people square in the eye and lie to you every

time that he opened his mouth and even after you have told him he is a liar, that is what you did when you came back in yesterday, you told him he was a liar, he still don't even level with you. He don't care. He don't care.... And has told you that he don't care by his actions. It makes no difference to him. I told you that it was an insult to you and to the Court. I have never seen one like this in all of the time. (T. 891).

6. [W]e are not talking about rehabilitation. You know, this is not in issue. We are talking about two things, either life without parole or the electric chair. So we are not saying well, maybe this guy will get better and we can rehabilitate him. That is not in issue here. We have passed the rehabilitation stage already. So we are not talking about that. So we are dealing with a person who let's say that—you know, if you have a dog that goes mad and you may even love the dog, but the dog is mad and you put the dog to death. And that is what we have got here, folks. (T. 893).

7. I submit to you that based upon the record here, based upon this man's demeanor in this courtroom how he has acted and what he has told you, **we are dealing with a mad dog. That is what you've got. And we are not talking about rehabilitating him. That is not at issue. We have got us a mad dog here. You don't do but one thing with a mad dog. You put him to death, don't you?** You might even love your dog. The family loves him. They weren't able to control him. I don't mean to be unkind, but that is what you have got. That is realistic. That is reality. And you are here to deal with reality. What have you accomplished if you put this man in the penitentiary for forty years and hope he don't escape? What have you accomplished by doing that? You have compromised your principles. You have done what you know is not the thing to do. That is not in your hearts and minds to do. That doesn't accomplish anything. **A mad dog, you put him to death.** And that is what the State of Arkansas by David and I today

are asking you to do. I think it is proper. I think that it is the thing that is necessary. I think it is the only reasonable, sensible, logical thing to do. I don't think that you can lay down at night, sleep knowing that you have allowed this man to live with the possibility of escaping again. He has already escaped once. He is an escapist. (T. 893, 894). (Emphasis added)

**Ladies and gentlemen I don't mean to create fear in you, but if you did do that, sentence him to life imprisonment with his having escaped once already and plan on holding him in any institution, I don't care what kind of institution it is, any institution for forty years or better, you are taking a terrific risk.** (T. 895). (Emphasis added)

At this point, defense counsel, Mr. Ross, stood and requested permission to approach the bench and the following exchange took place out of the hearing of the jury:

Mr. Ross: Your Honor, Mr. Burrow, assistant prosecutor, has just in effect told the jury that they should be in fear of their lives if they sentence this man to life imprisonment because he would escape—leaving them with the inference that he would escape and come after them. This is highly irregular and detrimental truly to provoke them into trying to protect their own lives, therefore, we ask for a mistrial.

Mr. Burrow: Your Honor, I was making a statement when Mr. Ross interrupted, that my statement was to continue that this is a great risk to society and certainly not to infer that anything in regard to this jury and would have completed that statement had Mr. Ross not interrupted me.

The Court: The motion for a mistrial will be denied.

Mr. Burrow: I'll be glad to proceed on if you feel like it.

The Court: You may continue.

Mr. Burrow resumes his closing argument as follows:

8. Ladies and gentlemen, as I was saying, I think that you are running a great risk that should you sentence this man to the penitentiary, any penitentiary, in hopes that they would be able to hold him there, that you are running a risk to society, to your fellow man, that if this man is loose, if he is free again, the exposure to other citizens of this state of—anywhere, anywhere where this man be, I don't think that you want to take that risk. I think you know your duty. I think that I can see what you have been thinking though the trial. I think you—I think you know what to do. I think you know what needs to be done and I think that you are going to do it. (T. 896).

By way of summary, the thrust of Miller's assertion that the prosecuting attorney's closing argument was improper and prejudicial may be characterized as follows:

1. The presence of the victim's family at trial was an expression of their wish that the jury impose the death sentence;

2. The jury should impose a sentence of death to save taxpayers the cost to be incurred in a life sentence without parole;

3. A penalty less than death would be an unfavorable compromise on the part of the jury;

4. Miller is a mad dog and a penalty less than death poses a threat to the jury;

5. Miller, an escape artist, if given anything less than the death sentence would pose a threat to society; and,

6. Miller failed to testify at the sentencing hearing.

■ Respondent contends that of the numerous instances of alleged prejudicial argument by the prosecuting attorney, Miller registered an objection only to the comment that Miller presented an escape risk and, thus, a threat to the jurors if not sentenced to death;

and that Miller has defaulted on the remaining expressions complained of and that this Court is procedurally barred from considering any other aspect of the prosecutorial expressions unless cause and prejudice are established for defense counsel's alleged default.

In reply, Miller argues persuasively that a fair reading of the trial record, and especially the exchange during the bench conference set forth above, as well as trial counsel's testimony at the evidentiary hearing conducted by this Court [2] refutes respondent's claim of procedural default.

The Court is not convinced, as asserted by respondent, that defense counsel's failure to object, in essence, to each expression of the prosecuting attorney complained of during closing argument amounted to procedural default which prevented the Arkansas Supreme Court from considering the issue.

First, the Court finds that the prosecuting attorney's comments during closing argument, indeed the expressions complained of, were so interlaced and interwoven that they constituted one theme that extended throughout the entire argument and, accordingly, defense counsel's motion for mistrial encompassed the expressions at issue.

Second, the Court is of the view that the Arkansas Supreme Court was afforded the opportunity to review the question under consideration when Rule 4–3(h) of the Arkansas Supreme Court is analyzed as well as the numerous opinions issued by the Arkansas Supreme Court addressing improprieties of prosecuting attorneys during closing arguments. Rule 4–3(h) provides:

(h) COURT'S REVIEW OF ERRORS IN DEATH OR LIFE IMPRISONMENT CASES. When the sentence is death or life imprisonment, the Court **must** review all errors prejudicial to the appellant in

---

**2.** The conference at the bench following defense counsel's motion for mistrial was brief prior to the trial court's ruling. Defense counsel testified, during the evidentiary hearing conducted by this Court, that he felt that he was deprived or curtailed in presenting his argument for mistrial by both the prosecuting attorney and the trial court; that he was of the view that after the trial court had ruled that the argument was proper

and further indicated that the prosecutor could continue, any attempt to further argue his position was futile; and that he had refrained from making specific objections to the prejudicial remarks during the course of the argument partly because Miller had twice been reprimanded by the trial judge during the argument, but primarily because he wanted the record sufficient to justify the granting of the motion for a mistrial.

accordance with Ark.Code Ann.Sec. 16–91–113(a). (Emphasis added).[3]

As noted, the Arkansas Supreme Court considered the expressions of the prosecuting attorney that were made just prior to defense counsel's motion for mistrial. But it is plain that the expressions complained of are all a part of the same web that the prosecutor was weaving at the time the motion for mistrial was made. *Walker v. State*, 313 Ark. 478, 485, 855 S.W.2d 932 (1993) ("Under Ark.Sup.Ct.R. 4–3(h) ..., when a sentence [of death or] of life imprisonment is imposed, we must review all errors which appear prejudicial to the appellant ... which were the subject of the motion for mistrial ...").

In *Williams v. State*, 294 Ark. 345, 349–352, 742 S.W.2d 932 (1988), the Arkansas Supreme Court made the following observation in addressing an issue regarding an alleged prejudicial closing argument of a prosecuting attorney:

> We have on numerous occasions dealt with closing arguments of overzealous prosecutors.... [i]n an unanimous opinion we stated:
>
>> Closing arguments must be confined to questions in issue, the evidence introduced and all reasonable inferences and deductions which can be drawn therefrom.... Whenever trial counsel argues matters that are beyond the record and states facts or makes assertions not supported by any evidence that are prejudicial to the opposite party, **there is clearly error....** (Emphasis added). **When objection is made, the presiding judge should appropriately reprimand counsel and instruct the jury to not consider the statement, and in short, do everything possible to see that the verdict of the jury is neither produced nor influenced by such argument....** The failure to sustain a proper objection to argument of matters not disclosed by the record is serious error, because it gives the appearance that the improper argument has not only the sanction but

the endorsement of the Court.... It has even been said that the overruling of a proper objection to a statement amounting to a declaration of law is tantamount to the giving of an instruction to that effect. (Emphasis added).

The Arkansas Supreme Court in affirming appellant's conviction in *Williams* at 351–352, 742 S.W.2d 932 made the following comment:

> Admittedly the prosecutor's statements were improper. However, we think the effect of the action taken by the trial court was to inform the jury that the argument presented by the prosecutor was not in evidence and could not be considered by them. Obviously, the best course of action would have been for the trial court to **immediately reprimand the prosecutor in front of the jury.** (Emphasis added). .... There is no indication in the present case that the verdict was attributed to or was in any manner influenced by the prosecutor's improper argument. The appellant was convicted of first degree murder and received a sentence of forty years. He could have been given a life sentence. In spite of the improper argument by the prosecutor we do not find prejudice has resulted under the facts of this case.... .... A prosecutor who conducts himself in such a manner runs the risk of costing the state and county a retrial or even the possibility of allowing a guilty person to escape punishment. We strongly discourage such conduct on the part of either counsel.... (Emphasis added).

In *Hall v. State*, 15 Ark.App. 235, 691 S.W.2d 884 (1985), defense counsel moved for mistrial during the prosecuting attorney's closing argument to the jury when the prosecutor alluded to the fact that defendant had not taken the witness stand to testify. The trial court while denying the motion for mistrial reread to the jury an instruction previously given that stated that remarks made during the trial and closing arguments by the attorneys are not evidence and if the remarks have no basis in the evidence the jury

---

**3.** Ark.Code Ann.Sec. 16–91–113(a) provides:

(a) The Supreme Court need only review those matters briefed and argued by the appellant, except that, where either a sentence for life imprisonment or death has been imposed, the Supreme Court shall review all errors prejudicial to the rights of the appellant.

should disregard them. A stenographic record was not made of the closing arguments and no one could recall the exact words used by the prosecutor, but it was agreed that the language employed by the trial judge in dealing with the objection was "close to the language" used by the prosecutor.

On appellate review, the Arkansas Court of Appeals in addressing the issue without the benefit of a complete record observed:

> We do not intend to say that comment of a prosecutor could not be so inflammatory as to be prejudicial even where the evidence against the defendant is extremely damaging and strong. We can visualize circumstances in which a statement could be so prejudicial as to cause us to vary that rule and say that the statement was so gross that it might have tipped the scales in the State's favor. Here we do not know exactly what the prosecutor said **or the context in which it was said. We have no way of knowing what statements immediately preceded the one objected to or the context in which the prosecutor was then speaking.... Without a record of what was actually said and the context in which it was said, we must presume that the trial judge was correct.** (Emphasis added).

*Id.* at 239, 691 S.W.2d 884.

From the brief review of their opinions in cases involving alleged prosecutorial misconduct, the Arkansas Supreme Court and the Arkansas Court of Appeals have concentrated and registered concern not only upon the effect of improper conduct upon a defendant's constitutional rights, but of any attempt on the part of a prosecutor to manipulate the justice system in order to obtain a conviction or, indeed, the supreme penalty at any price. A caution was issued in *Williams v. State,* supra, to the effect that a prosecutor who engages in such tactics not only runs the risk "of costing the state and county a retrial [but] even the possibility of allowing a guilty person to escape punishment."

In the instant case, a complete record was made of the prosecuting attorney's closing argument; the trial court simply denied defense counsel's motion for mistrial and directed the prosecutor to continue.[4] The action of the trial court not only gave the appearance of an endorsement, but its sanction as well. The Arkansas Supreme Court was afforded the opportunity to assess the circumstances in order to determine whether the prosecutor's argument "was so gross that it might have tipped the scales in the State's favor," but elected not to do so.

Accordingly, this Court rejects respondent's argument that this Court is limited to the prosecutor's escape comment under the pretext that the state tribunals were not afforded the opportunity to consider all of the federal constitutional claims asserted by Miller.

It is well recognized that a defendant in a criminal proceeding, whether capital or noncapital, enjoys Fifth and Fourteenth Amendment protection against adverse comment on the defendant's silence by a prosecutor. See, *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). As the Supreme Court observed in *Carter v. Kentucky,* 450 U.S. 288, 301, 101 S.Ct. 1112, 1119, 67 L.Ed.2d 241 (1981), in emphasizing the value of this fundamental right, a "defendant must pay no [prosecutor-induced] price for the exercise of his constitutional privilege not to testify." This Court is of the view that the prosecutor's comments on Miller's failure to testify, during the sentencing proceeding, in the context of the prosecutors's inflammatory remarks were improper, prejudicial, costly and constituted reversible error.

In addition, this Court is persuaded that the prosecutor's expressions characterizing Miller as a mad dog, an escape risk, a threat to the jurors' safety if the death sentence was not imposed; and that a life sen-

---

4. The trial court did not give the jury a cautionary instruction. In *Williams,* supra, the trial court, *sua sponte,* reread an instruction to the jury immediately following the improper expression by the prosecutor advising the jury that argument of the prosecutor was not in evidence and could not be considered by the jury.

tence, in effect, would require taxpayers to underwrite huge costs would as well constitute an improper compromise and violation of the jurors' oath implicated Miller's Eighth Amendment right by not only minimizing the jury's duty and responsibility, but injecting irrelevant factors into the jury's decision-making responsibility. See, *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (a jury's discretion to impose the death sentence must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

In *Woodson v. North Carolina* at 304–305, 96 S.Ct. at 2991, the Supreme Court made the following observation:

> ... [W]e believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

> This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100–year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

Accordingly, the Court finds that Miller is entitled to relief on this claim.

## II.

■ Miller asserts that he was deprived of his right to be tried by a fair and impartial jury secured under the Sixth and Fourteenth Amendments as articulated in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Miller contends that forty-nine jurors were voir dired, and that thirty-five jurors stated that they had no scruples against the death penalty while fourteen stated that they had scruples

against the death penalty. Of the fourteen with scruples, two, Kimble and Keyes, were considered only as alternates and their exclusion is irrelevant. Of the twelve remaining potential jurors who voiced scruples against the death penalty, eleven were excused for cause over Miller's objections. Miller further argues that a review of the transcript demonstrates that prospective jurors Russell, Vogel, Washington, Ingram and Whitehead (Howard) should not have been excluded under the principles announced in *Witherspoon* and its progeny.

Respondent contends that Miller in his direct appeal to the Arkansas Supreme Court and in his post conviction petition argued only that jurors Vogel, Washington, Griffin and Whitehead (Howard) had been improperly excluded by the trial court and, as such, Miller has defaulted as to jurors Russell and Ingram and this Court may not consider Miller's argument as to Russell and Ingram.

The Arkansas Supreme Court, in reviewing Miller's claim of *Witherspoon* violations, found that the record of the voir dire supported the trial court's decision to exclude the jurors complained of in both the direct appeal and post conviction proceeding.

After carefully reviewing the record of the voir dire, this Court is unable to find that the trial court acted unreasonably in concluding that the five prospective jurors' views on capital punishment would "prevent or substantially impair the performance of [their] duties as [jurors] in accordance with [their] instructions and [their] oath[s]." See, *Wainwright v. Witt,* 469 U.S. 412, 429, 105 S.Ct. 844, 855, 83 L.Ed.2d 841 (1985). The Court finds that this claim is without merit.

## III and IV

■ Miller argues that the evidence was insufficient to support the jury's findings of aggravating circumstances; and that the Arkansas Supreme Court in reviewing the sufficiency of the evidence pertaining to the aggravating circumstances, employed a standard of review that "renders rational and meaningful review of the sentencing process impossible" and is less than the required reasonable doubt standard which denied Miller due process of law as well as rights

secured under the Eighth and Fourteenth Amendments.[5]

This Court is persuaded the Arkansas Supreme Court, as reflected in the majority opinion, *Miller v. State,* supra, did not conduct "a meaningful appellate review of the appropriateness of the death penalty [in Miller's case with respect to] the sufficiency of the evidence" to support the jury findings regarding any of the statutory aggravating circumstances that falls far short of the requirements for a constitutionally imposed death sentence. See, dissenting opinion of C.J. Fogleman in *Miller v. State* at 358–E, 605 S.W.2d 430.

The jury found that Miller knowingly created a great risk of death to a person other than the victim; and that Miller committed the capital felony murder for the purpose of avoiding or preventing arrest or to escape from custody.[6] On direct appeal to the Arkansas Supreme Court, Miller challenged the sufficiency of the evidence to support these two findings as well as aggravating circumstance number IV that Miller committed the capital felony murder for pecuniary gain. The Arkansas Supreme Court's majority opinion in rejecting Miller's argument observed that it did not consider a jury's findings on aggravating circumstances as separate "little verdicts" and on appellate review the court would not require the same amount of proof to sustain a jury's finding that an aggravating circumstance exists as it would to affirm a jury's finding of guilt if the circumstance was a separate crime. *Miller v. State,* 269 Ark. 341, 355, 605 S.W.2d 430 (1980). In articulating further the standard that is employed in assessing the sufficiency of the proof, the Arkansas Supreme Court observed:

> It is a matter of judgment whether the facts support the findings of the jury of **aggravating and mitigating circumstances,** but we will not substitute our judgment for the judgment of the jury that heard the evidence if there is a reasonable and understandable application of the facts to the statutory circumstances. The basic issue is whether, on the evidence, the jurors could sincerely and honestly have made the finding as **they** understood the question. If their answer to a question had been wholly arbitrary, a different problem would confront us. But here their answers were not arbitrary. We have before us a record of all the evidence presented to the jury to help us decide whether this jury acted capriciously in imposing the death sentence. We can put ourselves in the jurors' position and under-

---

**5.** At the time of Miller's trial, Ark.Stat.Ann. § 41–1301 (Repl.1977), provided that after a defendant was found guilty of capital murder, the jury heard additional evidence relating to specific aggravating circumstances, or mitigating circumstances. The statute provided as follows with reference to aggravating circumstances:

> The aggravating circumstances are limited to: (1) the capital murder was committed by a person imprisoned as a result of a felony conviction; (2) the capital murder was committed by a person unlawfully at liberty after being sentenced to imprisonment as a result of a felony conviction; (3) the person previously committed another felony any element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person; (4) the person in the commission of the capital murder knowingly created a great risk of death to a person other than the victim; (5) the capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody; (6) the capital murder was committed for pecuniary gain; or (7) the capital murder was committed for the purpose of disrupting or hindering the law-

ful exercise of government or political function. Ark.Stat.Ann. § 41–1303 (Repl.1977) (now codified as amended Ark.Code Ann. § 5–4–604).

**6.** During the penalty phase of Miller's trial, the jury found the following four statutory aggravating circumstances existed beyond a reasonable doubt:

I. The defendant had, beyond a reasonable doubt, previously committed another felony an element of which was the use of threat of violence to another person or creating a substantial risk of death or serious physical injury to another person.

II. The defendant did, beyond a reasonable doubt, in the commission of the capital felony murder knowingly create a great risk of death to a person other than the victim.

III. The defendant did, beyond a reasonable doubt, commit the capital felony murder for the purpose of avoiding or preventing an arrest or effecting an escape from custody.

IV. The defendant did, beyond a reasonable doubt, commit the capital felony murder for pecuniary gain.

stand what they meant by answering the interrogatories as they did. That we might have interpreted an interrogatory differently does not require us to set aside a death sentence that was deliberately and conscientious agreed upon by the persons who had the advantage of hearing the testimony as it was given. (Emphasis added relative to aggravating and mitigating circumstances. "[T]hey" was the Arkansas Supreme Court's emphasis.) *Id.* at 355, 605 S.W.2d 430.

This Court is of the view, just as Chief Justice Fogleman observed in his dissenting opinion, that the standard of review employed in Miller's case permits the sustaining of a death sentence based upon a finding by a jury of the existence of an aggravating circumstance **"just because 12 average citizens, untrained in the law, perhaps confused by the submission of an aggravating circumstance for which there was no basis, did the best they could but still 'deliberately and conscientiously' agreed upon a wrong answer in making a sincere and honest finding 'as they understood it.'"** (Emphasis added.) *Miller,* supra at 358–A, 605 S.W.2d 430 (Fogleman, C.J., dissenting).

Chief Justice Fogleman in expressing the value and importance of the scope of appellate review in death penalty cases and his concerns about the majority conclusion stated: "[the majority's decision does not] give any significance to the fact that a jury found an aggravating circumstance for which there was no evidentiary support, or even something less that substantial evidence, as we have defined it [in prior cases, opening the door] to arbitrary and capricious imposition of the death penalty[.]" Chief Justice Fogleman further observed:

> ... The majority has now effectively sawed off one of the legs upon which [sentencing and review procedures certainly leave no substantial risk that the death sentence will be imposed randomly, arbitrarily, capriciously, wantonly or freakishly, and tend to promote evenhanded, rational and consistent imposition of the death penalty] and has rendered our death penalty statute's constitutionality suspect. *Miller,* supra, at 358–D, 358–E, 605 S.W.2d 430.[7]

Chief Justice Fogleman in agreeing with the opinion of Justices Purtle and Mays that the evidence was insufficient to sustain the jury's findings that Miller knowingly created a great risk of death to a person other than the victim and that Miller committed the felony murder for the purpose of avoiding or preventing an arrest or effecting escape of custody made the following observation:

> Upon further extensive review of the record in this case, I must agree with my Brother Purtle that the evidence was not sufficient to support a finding that Miller knowingly created a great risk of death to a person other than the victim, Bolin. A jury could not have found this circumstance to exist without gross speculation. Giving the evidence on this circumstance its strongest probative force when viewed in a light most favorable to the state, it could not be classified as more than a scintilla. In addition to the facts related in Justice Purtle's dissent, the only evidence the jury might possibly have considered to support this finding was Hudson's testimony that when he was first confronted by Miller, who was holding the cash box in both hands and carrying it like was a heavy object. Miller made a move and commanded, "You get in here." Hudson demonstrated the move for the jury in a manner not disclosed by the record. Hudson never saw a weapon until Miller had come out the side door and gone down the street toward an alley, moving away from Hudson at all times. Perhaps the move Miller made when holding the box was

**7.** Justice Purtle, joined by Justice Mays, registered their strong dissent also to the decision of the Arkansas Supreme Court in sustaining the jury's finding that in the commission of the capital murder, Miller knowingly created a great risk of death to a person other than the victim and that Miller committed the felony murder for the purpose of avoiding or preventing an arrest or effecting escape from custody. These two justices were of the view that the evidence was insufficient to sustain these findings and that Miller's death sentence should be reduced to life without parole and extend the option to the State to either concur in the life sentence without parole or afford Miller a new trial.

justifiably interpreted by Hudson as an indication that Miller was reaching for a concealed weapon. Still, the requirements of this particular aggravating circumstance are not met by a showing that the accused knowingly created great **fear** of death by a person other than the victim; instead, Miller must have knowingly created a great **risk** of death to a person other than Bolin, i.e., Hudson. There is not the slightest indication that when Miller came out the side door that he ever saw, or even looked toward, Hudson. The only evidence in the case indicates that the gun Hudson saw Miller put in his belt was empty. *Miller,* supra at 358, 358–A, 605 S.W.2d 430.

■ It is readily apparent from the majority's opinion that the standard employed by the Arkansas Supreme Court in reviewing the findings of the jury was a lesser standard than a "reasonable doubt" analysis. The applicable statutory provisions as well as prior decisions of the Arkansas Supreme Court are crystal clear that the application of the reasonable doubt standard is required in appellate review of aggravating circumstances findings. See, *Collins v. State,* 261 Ark. 195, 548 S.W.2d 106, cert. denied 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 (1977); *Neal v. State,* 261 Ark. 336, 548 S.W.2d 135, cert. denied 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 (1977).

In *Collins,* 261 Ark. at 216, 548 S.W.2d 106, the Arkansas Supreme Court made the following observation:

The Arkansas judiciary is vested with broad powers to check the arbitrary, capricious, wanton or freakish imposition of the death sentence by a jury. Those powers exist at both trial and appellate levels. Appellate review of cases in which the death penalty has been imposed has always been more comprehensive than in other cases. For, e.g., error in failure to properly instruct the jury with reference to punishments that it might impose has been held to be reversible, **even though defendant did not request such an instruction.** (Citing *Webb v. State,* 154 Ark.

67, 242 S.W. 380; *Alford v. State,* 223 Ark. 330, 266 S.W.2d 804). *Id.,* 261 Ark. at 216, 548 S.W.2d 106.

As Chief Justice Fogleman stated in his dissenting opinion, the Arkansas Supreme Court in applying a lesser standard in reviewing Miller's penalty proceeding disregarded its own standards as set forth in prior cases and in so doing "has rendered our death penalty statute's constitutionality suspect." In other words, the Arkansas Supreme Court denied Miller process that the State of Arkansas has guaranteed him under statutory measures enacted by the Arkansas General Assembly as well as process established by the Arkansas Supreme Court over the decades in death penalty rulings.

In *Hicks v. Oklahoma,* 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980), the Supreme Court made the following relevant observation:

Where ... a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion ... and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.... Such an arbitrary disregard of the petitioner's right to liberty is a denial of due process of law.

■ The Court is of the view that standards employed by the Arkansas Supreme Court to determine the sufficiency of the evidence to support the jury's findings, relative to the aggravating circumstances at issue, were not adequate, and, accordingly, this Court will not accord the majority's decision a presumption of correctness and will make its own assessment of the undisputed facts anew.[8]

---

**8.** See: 28 U.S.C. § 2254(d)(2), (7) and (8), which provides:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the

It is plain that the victim was killed for no other purpose than to obtain the metal box containing the victim's money. In addition, it is clear that Miller was not in custody of any officials either immediately preceding the incident or immediately after the incident and, therefore, could not have been attempting to escape. Relative to avoiding or preventing an arrest, this Court is of the view that the evidence reflects that Miller concluded that he would never be identified and was not concerned about being arrested. The evidence reflects that Miller went to his personal residence at once and never took steps to flee or leave his immediate community.

The jury also found two additional aggravating circumstances: aggravating circumstance I that "The defendant had, beyond a reasonable doubt, previously committed another felony an element of which was the use of threat of violence to another person or creating a substantial risk of death or serious physical injury to another person[,]" and aggravating circumstance IV, that "The defendant did, beyond a reasonable doubt, commit the capital felony murder for pecuniary gain." The Court notes that the jury was operating essentially in a vacuum in rendering these findings and concluding ultimately that the death penalty was warranted beyond a reasonable doubt. It must be remembered that the jury was erroneously instructed by the trial court that the jury must unanimously find that mitigating circumstances existed. (See **infra** claim number VIII).

Accordingly, the jury was deprived of the right to assess the mitigating circumstances individually and weigh mitigating circumstances as each juror chose to do. See, *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). Because of the disadvantage and impairment that Miller's jury was confronted with in weighing and evaluating the aggravating circumstances as against mitigating circumstances, this Court cannot find that Miller's jury would have been justified in assessing the death penalty beyond a reasonable doubt.

The Court is persuaded that Miller is entitled to the relief prayed for in this claim.

## V.

Miller argues that he has been deprived of his Sixth and Fourteenth Amendment rights as a consequence of the systematic exclusion of potential jurors who expressed reservations about the death penalty. Miller did not brief the question, but simply advises the Court that he relies essentially on the allegations contained in his petition. The Court finds that Miller's argument is without merit given the Supreme Court's ruling in *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), rejecting a similar claim.

## VI.

The Court finds that Miller's sixth ground that the due process and equal protection clauses are violated since the crimes of capital felony murder and first degree murder are identical under the facts of this case is without merit. This same challenge

judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

. . . . .

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

. . . . .

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

to Arkansas' capital murder and first degree murder statutes was rejected in *Simpson v. Lockhart*, 942 F.2d 493 (8th Cir.1991). The appellate court stated that "[w]e therefore hold the overlapping capital felony murder and first-degree felony murder statutes are not unconstitutionally vague." *Id.* at 497. See also, *Hill v. Lockhart*, 824 F.Supp. 1327 (E.D.Ark.1993), aff'd in part and rev'd in part on other grounds, 28 F.3d 832 (8th Cir.1994).

### VII.

■ Petitioner's seventh ground is that the submission and finding of pecuniary gain as an aggravating circumstance to a capital robbery/murder is a double counting in violation of the Eighth and Fourteenth Amendments. He argues that the differences in the Arkansas and Louisiana capital murder statutory schemes makes the holdings in *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), renouncing a double counting argument inapplicable here. The Eighth Circuit's decision in *Perry v. Lockhart*, 871 F.2d 1384 (8th Cir.1989), cert. denied, 493 U.S. 959, 110 S.Ct. 378, 107 L.Ed.2d 363 (1989) found the distinction between *Lowenfield* and the Arkansas sentencing scheme to be immaterial so that the double counting argument fails.

### VIII.

Petitioner argues that his death sentence was rendered in violation of the Fifth, Eighth, and Fourteenth Amendments because the jury was improperly instructed regarding mitigation. During the sentencing phase, the jury was instructed as follows:

Instruction No. 1: You have found Eddie Lee Miller guilty of capital felony murder. The law provides that a person convicted of a capital felony murder shall be punished either by death by electrocution or by life imprisonment without parole. You will, after hearing arguments of counsel, again retire to deliberate and decide whether the defendant Eddie Lee Miller is to be sentenced to death or to life imprisonment without parole. In determining which sentence shall be imposed, you must make specific written findings as to the existence or absence of aggravating cir-

cumstances and as to the existence or absence of mitigating circumstances.... Appropriate forms will be provided....

Instruction No. 2: The aggravating circumstances set forth in "Form A", which is given to you, are the only circumstances that you may consider as aggravating circumstances.

If you find that one or more of these aggravating circumstances existed, beyond a reasonable doubt, at the time of the commission of the capital felony murder, you shall indicate your findings by checking the appropriate circumstance or circumstances on Form A entitled "AGGRAVATING CIRCUMSTANCES", which shall be furnished to you before retiring.

A mitigating circumstance is one which does not justify or excuse the offense in question but may be considered as reducing the degree of the defendant's punishment.

The circumstances set forth on "Form B" entitled "MITIGATING CIRCUMSTANCES", which will be given to you before you retire, are not the only circumstances, which you may consider as mitigating circumstances.

If you find that one or more of these mitigating circumstances existed at the time of the commission of the capital felony murder you shall likewise indicate your findings by checking the appropriate circumstance or circumstances on Form B entitled "MITIGATING CIRCUMSTANCES."

If you find that any other mitigating circumstance or circumstances existed which are not set out in Form B, you shall indicate this finding in the appropriate space on Form B and write in such circumstance or circumstances on back side of that form.

. . . . . .

The jury was then instructed to weigh the aggravating circumstances against the mitigating circumstances to determine the sentence.

The jury was provided three separate forms. The first one, labeled Form "A", *AGGRAVATING CIRCUMSTANCES*, contained a check list of eight aggravating cir-

cumstances. The jury was informed to place a check mark in the appropriate space and informed that the findings on aggravating circumstances must be unanimous.

The second form, labeled Form "B", *MIT-IGATING CIRCUMSTANCES,* stated as follows:

> The Jury will made [sic] each of the following findings by having its Foreman place a check mark ( ) in the appropriate space in the sentence in accordance with the Jury's findings. **Your findings must be unani-. mous.** Each member of the Jury will then sign at the bottom of this form. (emphasis added).

The form then contained six specific mitigating circumstances, with a space for the jury to indicate whether the circumstance was found to exist. Number seven contained a place for the jury to find additional mitigating circumstances not mentioned above. The jury was instructed that it was to indicate such an additional mitigating circumstance on the bottom or back side of the sheet.

The third form, labeled Form "C", *CON-CLUSIONS AND VERDICT,* required the jury to indicate whether aggravating circumstances existed beyond a reasonable doubt at the time of the capital felony murder, whether aggravating circumstances outweighed any mitigating circumstances and whether aggravating circumstances justified a sentence of death beyond a reasonable doubt.

The jury found the existence of four of the seven statutory aggravating circumstances and found no mitigating circumstance.

■■■ Petitioner argues that several errors in the sentencing phase warrant vacating his death sentence. Miller asserts that the jury was not informed as to the correct burden of proof with respect to the existence of mitigating factors, and that the jury was incorrectly instructed that its findings as to the existence of any mitigating circumstances had to be unanimous. Because the trial court's instructions and verdict form expressly limited the jury's consideration to only those mitigat-

ing circumstances unanimously found, petitioner argues that the principle that the sentencer not be precluded from giving effect to all mitigating evidence, established in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) was violated.

In addition to *Lockett,* petitioner asks that the Court apply the cases of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). Both these cases hold that instructions or state statutes imposing a "unanimity" requirement on mitigating circumstances are violative of the Eighth and Fourteenth Amendments.

In *Mills,* the Supreme Court vacated petitioner's death sentence finding that the mere possibility that the sentencing jury believed itself bound to find mitigating circumstances by a unanimous vote violated the Eighth Amendment.[9] The Court reiterated the concern expressed in *Lockett* that "the risk that the death penalty might be imposed in spite of factors which may call for a less severe penalty . . . is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." 438 U.S. at 605, 98 S.Ct. at 2965. Because the jury's failure to consider all the mitigating evidence because of the unanimity requirement "risks erroneous imposition of the death sentence, in plain violation of *Lockett,*" the Court in *Mills* remanded the case for resentencing. 486 U.S. at 375, 108 S.Ct. at 1866.

In *McKoy v. North Carolina,* the petitioner challenged the North Carolina sentencing scheme on the *Mills* ground. In North Carolina, jurors were instructed that a unanimous finding of the existence of mitigating circumstances was required. The Court rejected respondent's attempt to distinguish *Mills* on the ground that the North Carolina scheme allowed the jury to recommend life imprisonment if it felt that the aggravating circumstances did not call for the death pen-

---

9. The verdict form pertaining to mitigating circumstances used in *Mills* was very similar to the one used at petitioner's trial. However, in *Mills* the jury was instructed that it had to find that the

mitigating circumstances were proven by a preponderance of the evidence. *See* 486 U.S. at 385, 108 S.Ct. at 1871.

alty even if it had found several aggravating circumstances and no mitigating ones.[10]

Applying the *Mills* holding along with its emphasis on *Lockett* and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (holding that the statute may not preclude the sentencer from considering any relevant mitigating evidence), the Court remanded the case to the state court for resentencing.

It is clear that the sentencing scheme used in petitioner's case violates the line of cases beginning with *Lockett*. Respondent raises two arguments. First, it contends that the ruling in *Mills* should not be applied retroactively. Second, it argues that Miller's claim is procedurally barred.

▇▇▇ The Court will first address respondent's contention that this claim is procedurally barred. Petitioner objected to the sentencing forms at trial; this issue was raised on appeal and thoroughly discussed by the Arkansas Supreme Court. Because the issue of the improper sentencing procedure was raised at trial, and later raised and addressed by the Arkansas Supreme Court, the Court finds that there is no procedural bar. See *Starr v. Lockhart*, 23 F.3d 1280, 1287 (8th Cir.1994).

▇▇▇ With respect to the issue of retroactivity, the Court must determine whether the rule of *Mills* is a new rule not to be applied retroactively or whether it merely extends or expands upon a previously existing jurisprudence relating to mitigation in death-penalty cases.

The retroactivity rule was established in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). According to *Teague*, a new rule exists when it either "breaks new ground or imposes a new obligation on the States or the Federal Government" or "if the result was not dictated by precedent existing at the time the defendant's conviction became final." 489 U.S. at 301, 109 S.Ct. at 1070.

The State argues that the rule of *Mills* is a new one and is therefore not entitled to

retroactive application. The Court does not agree. A review of death cases subsequent to *Mills* supports this conclusion.

In *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), petitioner challenged the Texas death scheme for its limitation on the sentencer's consideration of the mitigation circumstances of petitioner's mental retardation and abused background. Petitioner asserted that the jury's affirmative response to three "special circumstances" which are designed to incorporate factors of mitigation prevented it from giving full effect to mitigating circumstances. In effect, the special interrogatories submitted to the jury were not drafted or defined in a way that would permit the jury to consider and give effect to Penry's mitigating evidence in answering those questions.

The Supreme Court held that *Lockett* and *Eddings* controlled the consideration of Penry's claim and that those decisions were bottomed on notions of individualized sentencing in capital cases. The Court concluded:

> The rule Penry seeks—that when such mitigating evidence is presented, Texas juries must, upon request, be given jury instructions that make it possible for them to give effect to that mitigating evidence in determining whether the death penalty should be imposed—is not a new rule under *Teague* because it is dictated by *Lockett* and *Eddings*.

492 U.S. at 318–19, 109 S.Ct. at 2947. Rules which are extensions of existing rules are not new. Penry's right to have the jury consider mitigating circumstances as guaranteed by the Eighth and Fourteenth Amendments had been decided previously in *Lockett* and *Eddings*.

In *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), the Court analyzed the petitioner's claim that the trial court's instruction to the jury to "disregard sympathy" during sentencing impermissibly limited its consideration of mitigating circumstances under the *Lockett* line of cases. The majority held that the petitioner was advo-

---

**10.** The Maryland procedure in *Mills*, required the jury to impose the death penalty if it found at least one aggravating circumstance and no miti-gating circumstances or unanimously agreed that the mitigating circumstances did not outweigh the aggravating ones.

cating a new rule, that juries should consider their sympathetic feelings on sentencing, and barred the retroactive application of it. The Court found critical the distinction between the jury's access to mitigating information, that is, what it could consider, and the state's right to guide the jury's consideration of mitigating factors, that is, how it should consider them.

There is a simple and logical difference between rules that govern what factors the jury must be permitted to consider in making its sentencing decision, and rules that govern how the state may guide the jury in considering and weighing those factors in reaching a decision.

. . . . .

Here, by contrast, there is no contention that the State altogether prevented Parks' jury from considering, weighing, and giving effect to all of the mitigating evidence that Parks put before them; rather Parks' contention is that the State has unconstitutionally limited the manner in which his mitigating evidence may be considered. As we have concluded above, the former contention would come under the rule of *Lockett* and *Eddings;* the latter does not.

494 U.S. at 490–91, 110 S.Ct. at 1262.

*Lockett* dealt with access to mitigating circumstances and the effect required to be given to them. Since nothing in that case or those that followed prohibited a state from attempting to ensure reliability and the absence of arbitrariness by requiring that the jury consider and give effect to a defendant's mitigating evidence in the form of a reasoned moral response rather than an emotional response, the Court reasoned that the petitioner's rule was new.

The Court, in reviewing the line of cases dealing with mitigating circumstances, sees in the *Mills–McKoy* rule a clear application of *Lockett* 's demand that juries consider all mitigating circumstances. *Mills* is therefore not a new rule under *Teague,* and petitioner's unanimity claim applies retroactively. *See Smith v. Armontrout,* 888 F.2d 530, 545 (8th Cir.1989) (rule that juries must be free to consider any and all evidence as a mitigating factor has been a familiar feature of the legal landscape since 1978 when *Lockett* decided, therefore tools to make *Mills* argument were available in 1981).

Having addressed the two arguments raised by the State, the Court finds the holdings of *Mills* and *McKoy* apply. By requiring the jury to unanimously find mitigating circumstances, petitioner's constitutional rights were violated. Therefore, the Court must vacate the death sentence and order resentencing on the basis of this constitutional defect.

## IX.

Miller asserts that he was denied his rights under the Sixth and Fourteenth Amendments to a jury drawn from a fair cross section of the community and to equal protection of the law by the prosecuting attorney's deliberate and systematic use of peremptory strikes and the jury summoning system to exclude African–Americans from petit juries.

Miller essentially raises two separate claims, each of which must be analyzed separately. First, Miller claims that he was denied his right to jury drawn from a representative cross section of the community. To establish that the fair cross section requirement is violated, petitioner must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process." *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

Respondent asserts that Miller has procedurally defaulted on his claim that the jury commissioner system used to impanel the venire from which his petit jury was selected violated his constitutional rights. It is clear that Miller did not object to the jury summoning process at trial, on appeal, or in his Rule 37 petition. Mention is made of the jury selection procedure, but this is limited to Miller's argument concerning peremptory challenges.

Because of Miller's failure to raise his claim in state court, the Court is precluded from considering it unless Miller can show cause for the default and prejudice resulting therefrom. *Tippitt v. Lockhart*, 903 F.2d 552, 554 (8th Cir.1990), cert. denied, 498 U.S. 922, 111 S.Ct. 301, 112 L.Ed.2d 254 (1990). Miller has not offered any justification for his failure to present the fair cross-section claim to the state courts.

■ However, even assuming that Miller has not defaulted on this claim, the Court finds that it is without merit.[11] Of the 147 jurors summoned, 67 (or 45.58%) of the jurors were African–American. Dr. Berry, a research scientist, testified that based on his statistical analysis, the number of African–Americans actually summoned was greater than would have been expected based on chance.[12] Thus, the summoned jury panel did not underrepresent African–Americans. In fact, Dr. Berry stated that there was no evidence of any violation of a random selection procedure in the summoning of the jury.

Seventy-three people actually appeared at the courthouse, 31 of whom (or 42.47 percent) were African–American. Thus, African–Americans still were overrepresented in terms of the people who showed up at the courthouse as potential jurors. After some jurors were excused by the Court, 48 jurors are left, of whom 21 (or 43.75%) were African–American.

There is no evidence that African–Americans were underrepresented in venires in Crittenden County from around the same time as Miller's trial. Dr. Berry testified that in the very late 1970s, there were instances where more African–Americans were on the panel than one would expect on the basis of chance alone. Dr. Berry noted that from 1977 through 1980 he would not reject

the idea that there was a random sampling procedure to generate the list of summoned jurors in effect in Crittenden County.

Thus, the Court finds that Miller has not demonstrated that his rights under the 6th and 14th Amendments to a jury drawn from a fair cross section of the community were violated.

■ Second, Miller contends that the prosecutor's systematic use of peremptory strikes violated his right to equal protection of the laws. This claim is governed by *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).[13]

> Under *Swain*, a defendant can make out a prima facie case of purposeful discrimination on proof that the prosecutor perverted the peremptory-challenge system by using his challenges 'to exclude blacks from the jury "for reasons wholly unrelated to the outcome of the particular case on trial," or to deny to blacks "the same right and opportunity to participate in the administration of justice enjoyed by the white population." '

*Garrett v. Morris*, 815 F.2d 509, 511 (8th Cir.1987) (quoting *Batson v. Kentucky*, 476 U.S. 79, 91, 106 S.Ct. 1712, 1720, 90 L.Ed.2d 69 (1986)).

■ Inquiry into a prosecutor's reasons for exercising the challenges is not required under *Swain*, as the presumption exists that the prosecutor is using the challenges to obtain a fair and impartial jury. However, the presumption may be overcome by showing that the prosecution has systematically excluded African–Americans from petit juries over a period of time. *Id.*

■ While a pattern of exclusion must be established, the petitioner "is not required to

---

11. There is perhaps some argument that the Arkansas Supreme Court considered whether Miller had been denied a fair cross section. It noted that "[t]here is no evidence here that any **class** of persons was deliberately and systematically excluded from the jury panel.... We find no violation of appellant's constitutional rights in the make-up of that jury." 269 Ark. at 351, 605 S.W.2d 430.

12. Dr. Berry stated that the population breakdown in Crittenden County for 1980 was 56.42%

white; 42.88% African–American. The breakdown for the voting population in 1980 was 61.36% white; 37.99% African–American.

13. *Swain* was overruled in part by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The ruling in *Batson*, however, does not apply retroactively to a case on federal habeas review. *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986).

show that the prosecutor **always** struck every black venireman offered to him." *Willis v. Zant,* 720 F.2d 1212, 1220 (11th Cir.1983), cert. denied, 467 U.S. 1256, 104 S.Ct. 3546, 3548, 82 L.Ed.2d 849, 851 (1984) (emphasis in original). See also, *U.S. v. Pearson,* 448 F.2d 1207, 1217 (5th Cir.1971) ("We do not read *Swain* as meaning that the attack on the Government's use of its challenges must fail if the impermissible use is not exercised one hundred percent of the time.") Proof may be presented by direct evidence, such as testimony, or indirect evidence such as statistical proof. *Willis,* 720 F.2d at 1220 n. 18.

 Miller argues that David Burnett, the prosecutor in his case, had a history of systematically excluding African–Americans as jurors through the use of peremptory challenges. Indeed, Ross, Miller's trial counsel was cognizant of Burnett's actions, and filed a "Motion to Restrict the State from Striking All Blacks on Jury Panel" prior to trial. That motion was denied. During voir dire, when Ross objected to Burnett's use of his peremptories to strike five African–American jurors, Burnett stated "I am going to exercise my challenges in however I see fit."

The jury panel initially consisted of an overrepresentation of African–Americans. In fact, almost half the panel was African–American. However, Burnett used all ten of his peremptory challenges to strike African–American jurors, thereby leaving Miller with a jury comprised of nine whites and three African–Americans.[14]

Dr. Berry stated that due to the limited number of summoned jurors who actually appeared and the percentage of African–Americans on the panel, it was apparent that there would necessarily be some African–Americans on petitioner's jury. However, the jury selection process in Miller's case evinced a systematic decimation of African–Americans as potential jurors through the prosecutor's use of peremptory challenges. Dr. Berry noted that the lower incidence of African–Americans serving as jurors could

not be explained as a result of random selection.

Based on his review of the cases which Burnett had prosecuted, Dr. Berry made the following observation:

We could add say the Miller case, the Ward case, and we could start piling case upon case upon case, and I think that the pattern that begins to emerge when you do that is that at those post peremptory stages, when the prosecution begins to exercise peremptory challenges, it doesn't seem to be based upon some kind of pattern of legitimate objections of potential bias. It seems to be based upon a pattern of what color is the potential juror's skin. If they are black, strike them. That is a consistent pattern that I think is obvious and visible beyond the Ford [Clay Anthony Ford] case.

A number of practicing attorneys testified to the prosecutor's systematic and consistent use of peremptory challenges to exclude African–Americans from juries.[15] Bill Ross, Miller's attorney, had practiced law since 1968, and became a public defender for Mississippi County in September, 1974. He had participated in over fifty jury trials. When asked about his belief that the prosecutor would use his peremptory challenges against prospective African–American jurors, Ross testified as follows at the evidentiary hearing:

Q: Had you encountered this before in your practice?

A: Yes.

Q: Okay. Would you say you had encountered it often?

A: Yes.

Q: Was it done in all cases, or was it done more often in more serious cases?

A: I think it was done pretty well in most of the cases that I dealt with. I think they would normally, if they were going to exclude, they would exclude blacks from the jury. They just didn't feel that they would be as prosecution oriented

---

14. The prosecutor used nine of his peremptory challenges to strike African–Americans from the jury and his tenth to strike an African–American alternate juror.

15. Burnett was the prosecutor for both Crittenden and Mississippi counties.

I suppose. But they did exclude them with peremptory challenges.

. . . . .

Q: Had you experienced that through that time period [from 1968 through 1979]?

A: Yes.

Q: Are you aware of other attorneys that have voiced the same complaint.

A: Yes.

Ken Cook, a Crittenden County deputy public defender from January, 1980 to October, 1985, was personally aware of Burnett's reputation for systematically excusing African–American prospective jurors. He testified at the evidentiary hearing in the Clay Anthony Ford habeas case as follows:

Q: What are you referring to when you were saying it was pursuing the type of voir dire it always did pursue? Were you talking about striking blacks?

A: Yes

Q: That was a reputation of the prosecution, no doubt about that, isn't that true?

A: There was more than one prosecutor over there. David Burnett was the chief or whatever they call the prosecutor but it was a fact of life in most cases.

Q: Particularly in murder cases?

A: With black defendants—

Q: Yes

A: —and a white victim.

He continued, "I think I heard [Burnett] deny that he intentionally struck blacks, but my experience was that that's exactly what he did."

In his fifth motion for summary judgment, petitioner submitted the affidavits of practicing attorneys. Oscar Fendler stated that he has been a licensed attorney since 1933, after graduating from Harvard Law School and has practiced law continuously in Blytheville except for four years when he was in the United States Navy. During his many years of practice, he had occasion to try criminal cases. He noted if an African–American made it to the jury panel, the prosecutor would use a peremptory strike to keep him or her off the jury.

Samuel Turner, Jr., a member of the bar since April 4, 1975, stated that in his limited experience in criminal cases, he observed in one of the cases he tried, State v. Ronald Ward, the prosecutor using peremptory strikes to excuse all African–Americans from the jury.

Thomas G. Montgomery stated that he has practiced criminal law since 1974 and has been the Crittenden County Public Defender since December 1977. He stated: "During the period 1974 through 1985, there were several occasions when I have made objection at trial to the prosecution's exclusion of blacks from the jury through the use of peremptory challenges, as well as objections to the lack of black jurors appearing on the jury panel."

Additional support is found in other cases where Burnett was the prosecutor. In State v. Leroy Alexander, tried on February 27, 1979, defense counsel objected to prosecutor Burnett's "systematic exclusion of blacks from the jury" and the state's use of all of its peremptory challenges to excuse black jurors.

In State v. Clay Anthony Ford, tried in May, 1981, Burnett used his peremptory challenges to exclude the remaining five African–American jurors.

The Court is persuaded that Miller has established that the prosecutor consistently and systematically excluded African–Americans from participating as jurors through the use of peremptory challenges. Miller has presented evidence of a pattern of exclusion through the use of direct testimony and indirect statistical proof. Such is sufficient to meet his burden of establishing that his rights to equal protection were violated. See, Jones v. Davis, 835 F.2d 835 (11th Cir. 1988), appeal after remand 906 F.2d 552 (11th Cir.1990), cert. denied, 498 U.S. 1109, 111 S.Ct. 1019, 112 L.Ed.2d 1100 (1991) (defendant met burden by presenting testimony of six criminal attorneys who testified to having observed a pattern and practice on the part of the prosecutor to use peremptory challenges systematically to strike African–Americans from the jury venire.) Respondent has offered no evidence to refute or rebut petitioner's claim.

Thus, the Court finds that both the conviction and the sentence are invalid and must be set aside.

## X.

Miller argues that the Arkansas death penalty statute is unconstitutional because it penalizes the exercise of one's Sixth Amendment right to trial by jury in that the death penalty can only be imposed by a jury and, therefore, one who exercises his right to trial by jury subjects himself to a possible sentence of death whereas one who pleads guilty cannot be sentenced to death. This argument has been rejected by the Arkansas Supreme Court in *Ruiz v. State*, 275 Ark. 410, 630 S.W.2d 44 (1982), cert. denied, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982) and by this Court in *Hill v. Lockhart*, 824 F.Supp. 1327 (E.D.Ark.1993), aff'd in part and rev'd in part on other grounds, 28 F.3d 832 (8th Cir.1994). See also, *Pickens v. Lockhart*, 542 F.Supp. 585 (E.D.Ark.1982), remanded, 714 F.2d 1455 (8th Cir.1983).

## XI.

Petitioner states that the imposition of the death penalty violated his rights under the Eighth and Fourteenth Amendments because the Arkansas Supreme Court was not required to, and did not, perform a comparative sentence review. He contends that the death sentence in this case is disproportionately severe in light of the circumstances of the case. Not only has petitioner failed to present any proof, but the Arkansas Supreme Court has clearly stated that it does afford a comparative review of a death sentence. *Hill v. State*, 278 Ark. 194, 644 S.W.2d 282 (1983).

## XII. and XIII.

Miller's twelfth and thirteen grounds are attacks on the constitutionality of the death penalty statute. These same arguments were rejected in *Hill v. Lockhart*, 824 F.Supp. 1327 (E.D.Ark.1993), aff'd in part and rev'd in part on other grounds, 28 F.3d 832 (8th Cir.1994).

## XIV.

Petitioner's final ground alleges, specifically listing eleven subjects, ineffective assistance of counsel at trial and on appeal. In his January 28, 1992 post hearing brief, he states that this ground is not being waived, but is not being briefed since this point was not fully developed at the evidentiary hearing and may not be necessary. On the current record before the Court, none of these arguments has merit.

## CONCLUSION

In conclusion, the Court finds, for the reasons and decisions expressed in this opinion, that both Miller's conviction and sentence should be vacated, set aside and held for naught. The State is afforded 120 days from the file-date of this memorandum opinion and judgment in which to retry Miller. If the State fails to do so, this Court will order Miller's immediate release.

IT IS SO ORDERED.