**Clay Anthony FORD, Petitioner,**

v.

**A.L. LOCKHART, Director Arkansas Department of Correction, Respondent.**

**Civ. No. PB–C–82–431.**

United States District Court, E.D. Arkansas, Pine Bluff Division.

Aug. 30, 1994.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

Clay Anthony Ford, an African–American man, was convicted of capital murder in connection with the death of a white Arkansas state trooper and sentenced to death by an all-white jury in Mississippi County. He has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

### PROCEDURAL AND FACTUAL BACKGROUND

On September 5, 1980, Sergeant Glen Bailey of the Arkansas State Police saw Ford driving at an excessive rate of speed.[1] Bailey crossed the highway median to give chase and radioed for assistance. Ford was stopped at a blockade on the exit ramp from Interstate Highway 55 into the city of Marion, Arkansas. Two police cars were in front of Ford and he stopped a short distance before reaching the first car. A uniformed trooper started walking toward Ford, who began to back up but discovered that Bailey had blocked him in from behind and was approaching Ford on foot. Ford got out of his car and shot Bailey, critically wounding him. Bailey died soon thereafter as a result of this wound.

Ford was shot by another state trooper as he attempted to escape on foot. He was arrested later that day at a nearby house. Officers learned that Ford had been driving a stolen car. Officers further learned that Ford had escaped from a work release program at the Memphis Community Service Center where he was serving a sentence for burglary and grand larceny.

The incident engendered a great deal of publicity. The trial court therefore granted Ford's motion for a change of venue from Crittenden County to Mississippi County. The jury convicted Ford of capital murder pursuant to Ark.Stat.Ann. § 41–1501 (Repl. 1977) (now codified as Ark.Code Ann. § 5–10–101(a)(3) (1993)) and on June 1, 1981, he was sentenced to death by electrocution.

Brian H. Ratcliff, Shackleford, Shackleford & Phillips, El Dorado, AR, Rickey H. Hicks, Barbara A. Griffin, Timothy O. Dudley, Little Rock, AR, for plaintiff.

Darnisa C. Evans Johnson, Asst. Atty. Gen., Atty. General's Office, Little Rock, AR, for defendant.

1. The Court basically recounts the facts as set forth in the Arkansas Supreme Court's decision, *Ford v. State,* 276 Ark. 98, 633 S.W.2d 3 (1982), as Ford does not challenge the sufficiency of the evidence.

Ford appealed his conviction and sentence to the Arkansas Supreme Court, which, in a 6–1 decision (Justice Hickman, dissenting), affirmed both. *Ford v. State*, 276 Ark. 98, 633 S.W.2d 3 (1982). Ford's petition for certiorari to the United States Supreme Court was denied. *Ford v. Arkansas*, 459 U.S. 1022, 103 S.Ct. 389, 74 L.Ed.2d 519 (1982).

Petitions to proceed pursuant to Rule 37 of the Arkansas Rules of Criminal Procedure were filed on December 15, 1982 and December 22, 1982. The Arkansas Supreme Court denied both of the petitions by *per curiam* orders dated December 20, 1982 and December 27, 1982.

On December 29, 1982, Ford filed a petition for writ of habeas corpus and requested a stay of the execution which had been scheduled for January 6, 1983. On January 3, 1983, the Honorable Elsijane T. Roy granted the petition for stay of execution and directed Ford to file an amended petition for writ of habeas corpus.

The petition was amended on January 27, 1983. The case was assigned to the undersigned after Judge Roy recused.

Pursuant to correspondence from petitioner, the Court appointed new counsel for petitioner. Ford filed a second amended petition for writ of habeas corpus on May 1, 1989.[2] The Court conducted several evidentiary hearings.[3]

Ford raises seven grounds for relief. Each will be addressed below.

## DISCUSSION

I. In ground one, Ford alleges that he was denied effective assistance of counsel at the guilt/innocence and penalty phases. In particular, Ford asserts that trial counsel, John Kendall Cook, failed to investigate and present mitigating evidence at the penalty phase and failed to develop and present an intoxication defense at the guilt phase.[4]

Respondent asserts that Ford's claim of ineffective assistance of counsel is procedurally barred because the claims were not presented to the state courts. *See Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Ford's claim of ineffective assistance of counsel should have been raised in his petition for post-conviction relief under Arkansas Rule of Criminal Procedure 37 but was not.

Ford's failure to raise his claim in state court can be excused only on a showing of cause for the default and prejudice from the alleged violation of federal law. *Coleman v. Thompson*, 501 U.S. 722, 750–51, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991). A petitioner who cannot meet the cause and prejudice standard can obtain review if the petitioner can demonstrate that the Court's failure to hear the claim would constitute a "miscarriage of justice," that is, that the petitioner can show "actual innocence." *Sawyer v. Whitley*, ── U.S. ──, ──── ────, 112 S.Ct. 2514, 2518–19, 120 L.Ed.2d 269 (1992). Ford presents several arguments to counter the state's claim of procedural default.

Ford first argues that the ineffectiveness of his post-conviction counsel, Patrick Goss, establishes cause for the default. He

---

**2.** Much of the delay in the case resulted from the parties' informal agreement to delay proceedings on a number of habeas petitions until the United States Supreme Court decided certain issues pertaining to the constitutionality of Arkansas' death penalty statute. *See Hill v. Lockhart*, 824 F.Supp. 1327, 1331 n. 2 (E.D.Ark.1993), *aff'd in part and rev'd in part*, 28 F.3d 832 (8th Cir.1994).

**3.** An evidentiary hearing was held before Magistrate Judge Young on November 7, 1990. Evidentiary hearings were held before the Court on April 30, May 1, and May 2, 1990, and August 5, 1991. In addition, an evidentiary hearing was held in *Miller v. Lockhart*, PB–C–81–152 on March 13, 14, and 15, 1991. The evidence presented at that hearing was made part of the record in this case.

**4.** Capital trials in Arkansas are bifurcated. Ark. Stat.Ann. § 41–1301 (1977), recodified as Ark. Code Ann. § 5–4–602 (1994). First the jury determines guilt or innocence. If a defendant is found guilty, a second proceeding begins, and the state and the defendant are provided an opportunity to present evidence relevant to mitigating and aggravating circumstances. The same jury determines the appropriate punishment, life imprisonment without parole or death.

contends that *Coleman* does not foreclose his argument, as that case dealt only with the default of claims not raised in an appeal of the state post-conviction proceedings. *Coleman* did not address the effectiveness of counsel at the first forum where a petitioner can effectively raise the ineffective assistance of trial counsel claim, that is, at the Rule 37 proceeding. Such an argument, however, is foreclosed by subsequent Eighth Circuit decisions.

In *Nolan v. Armontrout*, 973 F.2d 615, 617 (8th Cir.1992), the court found that even if the state post-conviction proceeding was the first time the petitioner could raise his claim, counsel's failure to do so did not excuse the procedural default. *See Battle v. Delo*, 19 F.3d 1547, 1553 (8th Cir.1994) (declining to reconsider *Nolan*). *See also Nave v. Delo*, 22 F.3d 802, 810 (8th Cir.1994) (applying holding of *Nolan*).

Second, Ford argues that he has established cause for the default because he did not authorize Goss to file a petition on his behalf. In *Williams v. Lockhart*, 862 F.2d 155, 160 (8th Cir.1988), *after remand*, 927 F.2d 374 (8th Cir.1991), the Eighth Circuit held that dismissal of Williams' second petition for writ of habeas corpus would be unfair if the first petition had been filed and litigated without Williams' knowledge, participation, or authorization.[5]

At the evidentiary hearing, Goss testified that when Ford's execution date was set, the director of the Arkansas chapter of the American Civil Liberties Union (ACLU) and two attorneys asked Goss to file a petition to the United States Supreme Court (H.T. 300).[6] Goss filed an application for a stay in the Supreme Court without contacting Ford (H.T. 301). After the stay was granted, Goss filed a petition for certiorari and met with Ford while it was pending (H.T. 302).

After the petition for certiorari was denied, Goss filed the Rule 37 petition. Goss did not seek Ford's authorization or his permission to file the petition (H.T. 302). Furthermore, there is no evidence that Ford ratified the unauthorized Rule 37 petition after Goss filed it.

Ford is foreclosed from pursuing his remedies under Rule 37. The Rule in effect at the time required that the petition be filed within three years of the date of commitment. A.R.Cr.P. 37.2(c). *See White v. State*, 277 Ark. 429, 642 S.W.2d 304 (1982). Subsequent petitions will not be entertained unless the original petition was specifically denied without prejudice to filing a second petition. A.R.Cr.P. 37.2(b) *Collins v. State*, 280 Ark. 312, 657 S.W.2d 546 (1983).[7] Thus, Ford is without further state remedies, and is barred from presenting his claim in state court.

In *Coleman v. Thompson*, 501 U.S. at 752–55, 111 S.Ct. at 2566–67, the Court held that

---

**5.** The standard of cause and prejudice used for abuse of the writ is the same as that applied to procedural default. *McCleskey v. Zant*, 499 U.S. 467, 489–90, 111 S.Ct. 1454, 1468, 113 L.Ed.2d 517 (1991).

**6.** References to the record of the state proceedings are designated as Tr. References to the transcript of the first evidentiary hearing in 1990 are designated as H.T. References to the transcript of the second evidentiary hearing in 1991 are designated as H.T. 2.

**7.** The post-conviction relief available to Ford at the time was specified in Rule 37 of the Arkansas Rules of Criminal Procedure. That Rule was abolished by the May 30, 1989 Per Curiam of the Arkansas Supreme Court, effective July 1, 1989, and was subsequently reinstated and revised by the October 29, 1990 Per Curiam of the Arkansas Supreme Court, effective January 1, 1991. *See* Publisher's Notes to Rule 37, Arkansas Code of 1987 Annotated (Michie 1994).

The Rule in effect at the time provided:
(b) All grounds for relief available to a petitioner under this rule must be raised in his original petition unless the petition was denied without prejudice. Any ground not so raised or any ground finally adjudicated or intelligently and understandingly waived in the proceedings which resulted in the conviction or sentence, or in any other proceedings that the prisoner may have taken to secure relief from his conviction or sentence, may not be the basis for a subsequent petition.
(c) A petition claiming relief under this rule must be filed in circuit court or, if prior permission to proceed is necessary ... in the Supreme Court within three (3) years of the date of commitment, unless the ground for relief would render the judgment of conviction absolutely void.
Rule 37.2, Arkansas Rules of Criminal Procedure.

a state prisoner must "bear the risk of attorney error that results in a procedural default" if the lawyer was his or her "agent when acting, or failing to act, in furtherance of the litigation." The Supreme Court fashioned the rule from the principles of agency law that "each party is deemed bound by the acts of his lawyer-agent." *Id.* 501 U.S. at 753, 111 S.Ct. at 2567 (quoting *Link v. Wabash Railroad Co.,* 370 U.S. 626, 630, 82 S.Ct. 1386, 1388–89, 8 L.Ed.2d 734 (1962)).

The Court finds that the Ford did not authorize the filing of the Rule 37 petition. Goss filed it without Ford's knowledge or participation. Therefore Ford should not be bound by the petition or Goss' failure to raise the ineffective assistance of counsel claim. *See Deutscher v. Angelone,* 16 F.3d 981 (9th Cir.1994).

The Court finds that Ford has established cause for the default. The prejudice flowing therefrom, that is, the failure to present mitigating evidence to the jury, as will be discussed below, deprived Ford of a fair trial at the penalty stage. Furthermore, as will be discussed below, the failure to present the mitigating evidence worked to Ford's actual and substantial disadvantage.

■ The Court, however, is not persuaded that Ford has demonstrated actual prejudice with regard to his claim that his counsel was ineffective for failing to raise the intoxication defense at trial.[8] At the time of Ford's trial, voluntary intoxication was a defense. *Varnedare v. State,* 264 Ark. 596, 573 S.W.2d 57 (1978) (overruled by *White v. State,* 290 Ark. 130, 717 S.W.2d 784 (1986)). However, Ford has not demonstrated that the jury would have found him not guilty of capital murder based on an intoxication defense.

■ Even assuming that the claim of ineffective assistance of counsel at the penalty phase is barred, the Court finds that the "actual innocence" exception applies in this instance. For the exception to apply, Ford must demonstrate by clear and convincing evidence that, but for the alleged constitutional error, no reasonable juror would have sentenced him to death under the state's sentencing law. *Sawyer v. Whitley,* —— U.S. ——, ——, 112 S.Ct. 2514, 2517, 120 L.Ed.2d 269 (1992).[9]

■ *Sawyer* involved the Louisiana death penalty statute where mitigating factors are not considered in determining eligibility for the death penalty. Arkansas, on the other hand, is a "weighing state."[10] An Arkansas sentencer must consider and weigh mitigating and aggravating circumstances before determining whether a defendant is eligible for the death penalty.[11]

8. In his second amended petition, Ford alludes to his argument that his trial counsel was ineffective at the guilt/innocence phase by stating: "Trial counsel failed to investigate readily available and relevant evidence that would have been admissible at both the guilt/innocence and penalty phases of the trial." Other than the argument that trial counsel failed to object to instances of misconduct by the prosecutor during his closing argument, Ford, in his brief in support of his second amended petition, does not raise the issue of ineffective assistance of counsel for failure to raise an intoxication defense.

The issue of an intoxication defense was raised during the evidentiary hearing. Ford introduced medical records from his hospital admission after the shooting showing that Ford was intoxicated. Cook stated that he knew Ford was intoxicated but did not present that as a defense (H.T. 227–228).

At the evidentiary hearing, two criminal lawyers who were certified as experts, testified that evidence of intoxication at the time should have been used during the penalty phase (H.T. 158, 173). Neither of the experts opined that had an intoxication defense been presented the result of the trial at the guilt/innocence phase would have been different.

9. The "actual innocence" exception also applies to the guilt/innocence phase. *McCoy v. Lockhart,* 969 F.2d 649, 651 (8th Cir.1992) (holding that *Sawyer* applies to the guilt phase). The Court cannot find, considering the weight of the evidence against Ford, that Ford has demonstrated by clear and convincing evidence that no reasonable juror would have found him guilty of capital murder.

10. The Court notes that the Ninth Circuit in *Deutscher v. Whitley,* 991 F.2d 605 (9th Cir.1993) examined the difference between the Louisiana sentencing procedure in *Sawyer* and that in Nevada, a weighing state like Arkansas. While the decision has been withdrawn, *Deutscher v. Angelone,* 16 F.3d 981 (9th Cir.1994), the Court is of the opinion that the discussion of the different statutory schemes is pertinent.

11. Ark.Stat.Ann. § 41–1302 (Repl.1977) provided:

(1) the jury shall impose a sentence of death if it unanimously returns written findings that:

As will be discussed *infra*, the evidence in support of mitigation is overwhelming and compelling. The Court is convinced that had the jury been presented evidence of the brutality Ford suffered as a child, along with evidence of intoxication, they would not, in their weighing of the mitigating and aggravating circumstances, have imposed the death penalty.

The Court will now address the merits of Ford's ineffective assistance of counsel claim. Cook, a part-time deputy public defender for Crittenden County, was appointed to represent Ford (H.T. 209). He had previously participated in three jury trials, although none of them involved murder (H.T. 209–210).

Cook admitted that he never investigated Ford's background or talked to family members about Ford's background. He stated that he relied on his investigator to interview witnesses and obtain evidence for the penalty phase (H.T. 212, 214, 253). However, Cook never learned whether the investigator spoke to family members.

Even a cursory investigation would have revealed that Ford was the victim of severe physical and psychological child abuse. At the evidentiary hearing, Ford's mother and one of his sisters testified to the sadistic and abusive behavior of his father, Willie Ford. Ms. Ford testified that her husband beat her and her children regularly. Ford suffered the brunt of his father's violent anger (H.T. 119–20).

Ford's older sister, Katie Ann Cleveland, testified in horrifying detail about her father's brutality. A former Marine, a college graduate, and at the time of the evidentiary hearing a readjustment counselor with the Veteran's Administration, Cleveland recalled her first memory of her father. She was "four or five years old, praying that my father would not—that my father wouldn't kill my mother" (H.T. 116). She described how her siblings watched her father regularly and viciously attack her mother, beating her or threatening to kill her as he pointed a gun at her head.

As an example of the abuse Ford suffered, Cleveland described a "ritual" her father performed on Ford and before his death, Ford's brother.[12]

> Before Willie Glenn's death, my father had this ritual thing that he would do with Willie Glenn and then with Clay. He would take them and he had—we had this great big cotton sack. It was a cotton sack that people used to use in the country to pick cotton. He would put Willie Glenn and Clay in a cotton sack and take them out to the garage. We had a garage behind our house and rafters up in the ceiling of the garage. And he would hang, he would hang the cotton sack over the rafters and put Willie Glenn and Clay in the sack and whip them with extension cords, and the way he would do this, is he would hang them there in the morning and he would whip them in the morning and they would hand [sic] until about noon and he would go out and whip them at noon, and he would leave them there until over in the afternoon, and he would always whip them again before he would cut them down, and when he cut them down, the sack, when you hang the sack over the rafter, it was at least about six or seven feet off the ground and it was a concrete floor in the garage, and he would just go up on a ladder and cut the sack down and it [sic] would just fall onto the concrete floor a lot of times from heat exhaustion ... (H.T. 121–22).

When Ford became "too big for the sack," his father would, on a regular basis, hang Ford by his wrists from the garage rafters with extension cords, leaving him for hours

---

(a) aggravating circumstances exist beyond a reasonable doubt; and
(b) aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist; and
(c) aggravating circumstances justify a sentence of death beyond a reasonable doubt.
The statute was amended in 1985 to provide that the Arkansas Supreme Court perform a harmless error review of a defendant's death sentence if on appeal the court finds that the jury erred in finding the existence of any aggravating circumstance and if the jury found no mitigating circumstance. Ark.Code Ann. § 5–4–603(d).

12. Ford's older brother was killed in a tragic fire when Ford was about eight years old (H.T. 95).

and whipping him from time to time (H.T. 122–23).

Ms. Ford similarly described the abuse:

> He [Ford's father] would whoop Clay bad, put him in a sack and tie him up in a cotton sack and put him across the rafter in the garage and whoop him with an extension cord and beat him until the blood just run from him.
>
> . . . .
>
> Q: How often would he beat Clay Anthony Ford?
>
> A: If he wasn't satisfied of the work that Clay had did for him on his car, he would whoop Clay and then he tell him his car motor had to be cleaned up. He would do that two or three times a week until he thought he was satisfied. But if it didn't look look right to him he would whoop him everyday if that was possible. He whooped him. He whooped Clay so bad. He would beat Clay so until Clay would have skin on him. It would just got to be real miserable. I would call the policemans in, but the policeman said that they had to catch him doing it. It was terrible, real terrible (H.T. 98–99).

Ford's father hit him with the buckle of a belt, causing gashes all over his face. When Ms. Ford took Ford to the emergency room, her husband beat her upon her return.

The abuse was psychological as well as physical. Ford was made to watch while his father brutalized his mother. However, Willie's psychological terror was not limited to his wife. Ms. Ford described another recurring act of brutality:

> He [Willie Ford] would get mad and at some time he would be on the outside out there, and I could smell something like he had been drinking. . . . He kept his guns in his car and he would bring his sawed-off shotgun in the house and make all his kids line up on the couch and tell the littlest one to the biggest one. "I'm going to kill you," and he would already be done drawing the hammer back on the shotgun and go around to everybody and put it on everybody's head and said, "I'm going to kill you." And everybody sitting there and then he say, "I'm going to kill you," and

then he lay his gun down and sometime when he unsnapped the gun and take it, he would hit me with the gun." (H.T. 103).

Ford's father was especially abusive toward Ford, particularly after his older brother died, and Ford became the eldest son. Willie Ford showed no love toward his son. He told Ford "that just as soon he put a dress on because he would never be nothing but a woman no way because he loved his mama too much . . ." (H.T. 101). In fact, Ford intervened on behalf of his mother when his father was beating her. Cleveland recounted:

> Clay was, he was very compassionate. He was always trying to do things to help. He was always trying to do things to help my mother. My father worked, and he had a good job . . . but he didn't support the family. He took his money out. And because of that Clay, when he got old enough, he went out and worked to try and help my mother support the family and support the children. He would always intervene. My sister and I were too terrified to even try to intervene when my father was beating my mother and Clay was, he was the only one that would try and intervene to try and stop my father from beating my mother, but he was a very compassionate, a very compassionate person (H.T. 125–26).

Ms. Ford testified that one time her husband threw Ford out the window when he tried to protect his mother. Another time, Willie Ford came after his wife with a brick. When Ford tried to intervene, his father hit Ford on the leg with the brick.

> Clay was always trying to do something whenever he could, you know, to stop him [Willie Ford] from doing things. And then he would stay out of his way because he know his dad would try to hurt him or something like that. But . . . he wouldn't do nothing for him, and he just abuse him all the time and beat him and beat on him and beat on him (H.T. 102).

Neither Cook nor a representative from his office spoke with family members about Ford's background, although Ms. Ford and Ms. Cleveland stated that they tried on several occasions to contact Cook both before

and during the trial (H.T. 105, 108–10, 124, 127, 128, 130, 139). Ms. Ford and Cleveland stated that they were never asked to testify on Ford's behalf at the penalty stage, although they both contended that they would have been willing to do so. Indeed, several family members attended the trial, and were greatly concerned about Ford. At one point during the trial, Ms. Cleveland and her mother, "panicked" by the news that they had heard on the television, went to Cook's office to find out if there was anything they could do. They never got the chance to talk to Cook, however (H.T. 130).

Ford testified that Cook never asked him about his background, or explained the difference between the guilt and penalty phases of the trial (H.T. 133, 138–39). Furthermore, Cook did not explain to Ford what kind of evidence might be helpful at the penalty stage.

Ford also contends that Cook was ineffective for failing to investigate Ford's intoxication at the time of the murder. The records from the hospital where Ford was treated after he was wounded and captured state that he was "vomiting and drunk" (H.T. Ex. 20). Ford stated that he was drunk on wine at the time of the offense and was "doing things" that he "wouldn't do" when he was sober (H.T. 109–112).

At the penalty phase, Cook presented one witness, Connie Floring, to testify on Ford's behalf. Ms. Floring testified that Ford did not harm her and was polite to her when he came to her house after fleeing the scene of the shooting. According to Floring, Ford did not threaten or harm her in any way (Tr. 1072–1076).

The right to effective assistance of counsel under the Sixth Amendment is "simply to ensure that criminal defendants receive a fair trial." *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). To prevail on his claim of ineffective assistance of counsel, Ford must prove that his lawyer's performance was deficient and that the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064 (1984).

There is no doubt that the information concerning the abuse Ford suffered as a child was important and relevant to mitigating circumstances. The failure of Cook to even investigate Ford's background and family falls "outside the range of professionally competent assistance ..." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Numerous cases have pointed to the duty of the lawyer to investigate all available evidence which might bear on a defendant's guilt and punishment. *See e.g. Hill v. Lockhart,* 28 F.3d 832, 844–45 (8th Cir.1994) (counsel was ineffective for failure to obtain evidence of psychiatric history); *Kenley v. Armontrout,* 937 F.2d 1298, 1304–08 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991) (counsel was ineffective for failing to investigate thoroughly defendant's social history, psychiatric disorders, disadvantaged childhood, and drinking problems in preparation for penalty phase); *Laws v. Armontrout,* 863 F.2d 1377, 1385 (8th Cir.1988) (en banc), *cert. denied,* 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989) (failure to discover mitigating evidence because of inadequate trial preparation and investigation is ineffective assistance); *Pickens v. Lockhart,* 714 F.2d 1455, 1467 (8th Cir.1983) (failure to investigate and present any mitigating evidence was ineffective assistance). " 'Given the severity of the potential sentence and the reality that the life of [the defendant] was at stake,' " Ford's counsel had a duty to collect as much information as possible about Ford for use at the penalty phase. *Hill v. Lockhart,* 28 F.3d at 844–45 (cite omitted).

At the evidentiary hearing, two criminal defense attorneys qualified as experts testified that Cook's assistance fell below minimum standards of competence. Samuel Perroni, a member of the Arkansas Bar since 1974, an Assistant United States Attorney for five and one-half years, and currently a criminal defense attorney with experience in over 100 jury trials, stated that a reasonably competent attorney would have presented to the jury evidence of the abuse Ford suffered as well as the evidence of intoxication. Perroni opined that the failure to present evidence of child abuse fell below the level of reasonable professional competence (H.T. 156).

Arthur Allen, a licensed attorney since 1982, was a public defender for five years. He then entered private practice, concentrating primarily on criminal cases. Allen has experience in over 90 jury trials, including seven where the death penalty was sought (H.T. 167–168). Allen stated, "there was a wealth of mitigation information that would have been available to Mr. Cook had he made even the most minimal effort to investigate that aspect of the case" (H.T. 172). He stated that "[a] minimally competent attorney would have sought out every available record to him .. everything from high school records to prior medical history" (H.T. 174).

Having determined that Cook's performance was deficient, the Court must determine whether Ford was prejudiced. The "prejudice" component of the *Strickland* test "focusses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell,* —— U.S. ——, ——, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993).

Under Arkansas law at the time, a jury could impose either life in prison without parole or the death penalty for murder. The death penalty could be imposed only if the jury unanimously found that the aggravating circumstances existed beyond a reasonable doubt, that aggravating circumstances outweighed beyond a reasonable doubt all mitigating circumstances, and aggravating circumstances justify a sentence of death beyond a reasonable doubt. Ark.Stat.Ann. § 41–1302(1)(c) (Repl.1977) (codified as Ark. Code Ann. § 5–4–603).[13]

Evidence of a background of abuse is both relevant and important to a jury's determination of appropriate punishment. *See Hitchcock v. Dugger,* 481 U.S. 393, 397–99, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987) (because evidence of the "difficult circumstances of [defendant's] upbringing" relevant to mitigating circumstances, jury must be given opportunity to consider such evidence); *Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982) ("Evidence of a difficult family history ... is typically introduced by defendants in mitiga-

tion."); *Lockett v. Ohio,* 438 U.S. 586, 603, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (evidence concerning the defendant's life and characteristics is highly relevant to the sentencing decision). *See also Pickens v. Lockhart,* 714 F.2d at 1466: "There is no dispute that evidence of a turbulent family background, beatings by a harsh father, and emotional instability may be relevant in mitigation."

Similarly, evidence of intoxication is relevant to mitigation. Indeed, the sentencing verdict form used in Ford's case listed as a mitigating factor:

> The capital murder was committed while the capacity of Clay Anthony Ford to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, intoxication or drug abuse. (Tr. 106)

In this instance, the jury found the existence of two aggravating circumstances:

> At the time of the capital murder Clay Anthony Ford was unlawfully at liberty after being sentenced to imprisonment as a result of a felony conviction.

> The capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody. (Tr. 105)

Although the jurors did not unanimously find the existence of any mitigating circumstances, some of the jurors indicated that the fact that Ford did not threaten or injure anyone between the time of the murder and arrest constituted a mitigating· circumstance (H.T. 107).

The Court is persuaded that had the jurors been provided information concerning the abuse Ford suffered as a child, along with evidence that he was intoxicated at the time of offense, they would have not imposed the death penalty. Here, even the most minimal information presented during the penalty phase caused some jurors to find mitigation. That some jurors would consider this evidence indicates that the jury would have been influenced by the compelling accounts

13. See *supra* note 11.

of abuse Ford suffered at the hands of his father.

This finding is supported by the conclusion of the two experts who testified at the evidentiary hearing. Both Perroni and Allen stated unequivocally that the introduction of evidence of the abuse during Ford's childhood alone would have changed the outcome at the penalty phase, that is, that the jury would not have imposed the death penalty (H.T. 155–156, 172). They stated that the inclusion of evidence that Ford had been drinking would only strengthen their opinion that the outcome at the penalty phase would have been different (H.T. 158, 174).

Ford "had nothing to lose and everything to gain" by presenting evidence of an abused childhood and intoxication. *See Foster v. Delo*, 11 F.3d 1451, 1458 (8th Cir.1993). In this instance, the jury was deprived of hearing important mitigating evidence which could have been presented in a sympathetic light.

Recently, this Court found that counsel's failure to present evidence with respect to the petitioner's history of mental illness during the penalty phase prejudiced the petitioner. *Hill v. Lockhart*, 824 F.Supp. 1327 (E.D.Ark.1993). In affirming that portion of the decision, and in vacating the petitioner's death sentence, the appellate court believed "that a reasonable probability does exist that the jury would have found the existence of at least one, and possibly two, mitigating circumstances" if the mitigating evidence concerning Hill's history on anti-psychotic drugs and his regression to a psychotic state when he stopped taking those drugs had been presented. The court found that counsel's failure "has shaken our confidence in the jury's determination that no mitigating circumstances existed." The court then found that

there was a reasonable probability that the jury, after weighing the mitigating and aggravating circumstances, would not have imposed the death penalty. *Hill v. Lockhart*, 28 F.3d at 846.

As the court found in *Hill*, the failure of Ford's lawyers to present the mitigating evidence rendered the penalty phase of his state court trial fundamentally unfair. *Hill*, 28 F.3d at 847. The Court is persuaded that based on the evidence the jury would have found the existence of at least one and more likely two mitigating circumstances, and would have concluded that the aggravating circumstances did not outweigh the mitigating circumstances beyond a reasonable doubt.[14]

Accordingly, the Court finds that trial counsel was ineffective in failing to investigate and introduce evidence relevant to mitigation, in particular evidence concerning his family background and childhood as well as evidence showing that he had been drinking before the shooting. The Court finds that Ford was prejudiced and that his death sentence must be vacated.[15]

■ II. For his second contention, Ford argues that his Rule 37 counsel was ineffective. This argument has been addressed above, and the claim must be denied. "There is no constitutional right to an attorney in state post-conviction proceedings.... Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman v. Thompson*, 501 U.S. 722, 752–53, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991) (cites omitted).

■ III. For his third claim, Ford contends that the percentage of African–Americans summoned to try him violated his Sixth,

---

**14.** That Ford was prejudiced at the penalty stage is further bolstered by the prosecutor's introduction of Ford's prior convictions at the sentencing stage of the trial so that the jury would not find as a mitigating circumstance that Ford had no significant history of prior criminal activity. The prior convictions were not admissible as an aggravating circumstance under Ark.Stat.Ann. § 41–1303(3) (Repl.1977). *See infra.*

**15.** Although Ford focusses primarily on counsel's ineffectiveness with regard to investigating and

introducing mitigating evidence, he raises additional claims of ineffective assistance of counsel. These include trial counsel's failure to object to certain instances of misconduct of the prosecutor's closing arguments. The Court has reviewed the record and has considered additional claims of ineffective assistance of counsel raised in the second amended petition and at the evidentiary hearing and concludes that they are without merit.

Eighth and Fourteenth Amendment Rights to have a jury selected from a representative cross section of the community. To establish that the fair cross section requirement is violated, petitioner must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process." *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

■■■■ A discriminatorily compiled jury also violates a defendant's right to due process and equal protection of the law. The standards for proving an equal protection claim are virtually identical to one under the Sixth Amendment; proof which satisfies the standard in *Duren* will also meet the equal protection standard of *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). As with a fair cross-section claim, an equal protection violation requires proof that the jury selection procedure "resulted in substantial underrepresentation" over a substantial period of time of a "recognizable, distinct class, singled out for different treatment under the laws." *Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1280. Proof of discriminatory purpose is required under a Fourteenth Amendment claim. Evidence of substantial underrepresentation of the distinctive group is evidence of intent to discriminate. *Id.* at 494 n. 13, 97 S.Ct. at 1280 n. 13 ("If a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process").

■■■■ In an effort to demonstrate that African–Americans have been substantially underrepresented on venires, Ford relies on data spanning 1970 through 1981. It is important at the outset to note that the system changed in 1980.

From 1970–1979, Chickasawba District used a jury commissioner system. The circuit judge chose the jury commissioners who convened in private and chose the persons to be summoned for jury service. Such a system, based on the choices of the jury commissioners, has been criticized as being "susceptible to abuse" and to being "employed in a discriminatory manner." *Hernandez v. Texas,* 347 U.S. 475, 479, 74 S.Ct. 667, 671, 98 L.Ed. 866. *See Ross v. Wyrick,* 581 F.2d 172, 174 (8th Cir.1978); *Murrah v. Arkansas,* 532 F.2d 105 (8th Cir.1976); *Sanford v. Hutto,* 394 F.Supp. 1278, 1283 (E.D.Ark.), *aff'd,* 523 F.2d 1383 (8th Cir.1975); *Waters v. State,* 271 Ark. 33, 607 S.W.2d 336 (1980) (all finding "key man" systems for selecting juries were discriminatory).

In 1979, the procedure for selecting jurors changed from the jury commissioner system to a jury wheel system. Under the latter system, set out by statute, and as applied in this case the circuit judge and the clerk met in October to determine the number or numbers that would have to be drawn from the registered voters for the Chickasawba District in order to select a master jury list for the next calendar year. (Ex. 12 and 13, H.T. 259). The judge selected by random sufficient numbers between one and 100 to satisfy the numerical requirement of prospective jurors. The person whose name appeared on the current voter registration list in the numerical position corresponding to the number or numbers selected by random was then selected as a prospective juror together with the 100th voter registrant appearing on the list after the starting number. The numbers were given to the computer operator who programmed the numbers into the computer and the computer selected a master jury list from all registered voters within the Chickasawba District (H.T. 280).[16] With respect to

---

16. Ark.Stat.Ann. § 39–205.1 (1985 Cum.Supp.) was made applicable to all circuit courts and counties within the state by Section 2 of Acts, 1979, and went into effect July 1, 1979. That statute provides in relevant part:

(a) During the month of November or December of each year, the prospective jurors for the following calendar year shall be selected from among the current list of registered voters of the applicable district or county in the following manner:

the jury venire selected for 1981, the circuit judge, at a pretrial hearing, stated as follows:

[P]rior to November of 1980 the clerk of Mississippi County and myself, as circuit judge, did convene at Blytheville and determined from the number of registered voters for the Chickasawba District of Mississippi County the number of numbers that would have to be drawn in order to select a master jury list for the calendar year 1981 consisting of fifteen hundred names.[17] Those numbers, as certified by the Court, were then given to the computer operator who programed [sic] those numbers into the computer and the computer did select the master jury list from all registered voters within the Chickasawba District of Mississippi County and exhausted those numbers until fifteen hundred prospective jurors had been selected by the computer. The numbers were selected strictly at random and by lot by the drawing of a tags [sic] numbered one through one hundred. After the required numbers were selected by random lot then those numbers were programed [sic] into the computer so that, for example, the sixty-seventh registered voter, the one hundred sixty-seventh, two sixty-seventh and so on down through the list of registered voters were selected and placed on the master jury list.

Tr. 201–02.

Ford presented the testimony of Dr. Ronald Berry, a research scientist, who analyzed the venires from 1970 through 1981. Dr.

Berry's analysis prior to 1980, however, is not relevant in this instance.[18] The Court must look at the statistics of 1980 and 1981, because it is the procedure by which the venire is selected that must be analyzed. *See Castaneda*, 430 U.S. at 494, 97 S.Ct. at 1280 (the defendant must show that the *procedure employed* resulted in substantial underrepresentation of his race) (emphasis added).

The statistical evidence does not support Ford's assertion of racial discrimination. In 1980, the first year under the jury wheel system, African–Americans were actually overrepresented (H.T. 2 55–57; Exhibit 40). In 1981, however, the number of African–Americans on the venire decreased, and Dr. Berry concluded, based on his statistical analysis, that the venire was not the product of a random selection procedure (H.T. 2 71; Exhibit 45).

While it is true that African–Americans were underrepresented, the Court cannot find that there was "substantial disparity" or "substantial underrepresentation" to warrant a finding of discrimination. The evidence reveals an absolute disparity, or difference between the actual and expected percentages of African–Americans on the venire, to be about five percent.

The exact disparity necessary to make out a prima facie case of discrimination has not been defined precisely. *Swain v. Alabama*, 380 U.S. 202, 208–09, 85 S.Ct. 824, 829–30, 13 L.Ed.2d 759 (1965) established a threshold of

The Circuit Judge, in the presence of the Circuit Clerk, shall select by random a number between one (1) and one hundred (100), inclusive, which shall be the starting number, and the Circuit Clerk shall then select the person whose name appears on the current voter registration list in that numerical position, counting sequentially from the first name on the list; the Circuit Clerk shall then select the 100th voter registrant appearing on the list after the starting number. An [As] an example, if the starting number is 67, which is the first selection, the second selection would be the 167th registered voter, the third selection would be the 267th registered voter, and so forth until the current registered voter list is exhausted, and the Circuit Judge and the Circuit Clerk shall then repeat the random selection process until the number of jurors set out in this Section have been selected.

Ark.Stat.Ann. § 39–205.2 (Cum.Supp.1985) provided that the clerk may utilize computers for the purpose of selecting the jury panels from the voter registration lists.

Ark.Stat.Ann. §§ 39–205.1 and 39–205.2 have been amended and codified as Ark.Code Ann. § 16–32–103 (1994).

17. The evidence reveals that 1300 prospective jurors were chosen for the 1981 master list of prospective jurors (Ex. 13).

18. The Court notes, however, that Dr. Berry testified that from 1977 through 1980 he would not reject the idea that there was a random sampling procedure to generate the venires (Ex. 38). Furthermore, in 1979, African–Americans were overrepresented on the venire in proportion to their percentage in the district (Ex. 40).

ten percent as the minimum disparity. *See Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) (14% disparity sufficient); *Sims v. Georgia,* 389 U.S. 404, 407–08, 88 S.Ct. 523, 525–26, 19 L.Ed.2d 634 (1967) (14.6% disparity sufficient); *Murrah v. Arkansas,* 532 F.2d 105, 108–10 (8th Cir.1976) (disparity between 12.48% and 14.11% sufficient).

In *Murrah,* the Eighth Circuit quoted with approval the following from *Blackwell v. Thomas,* 476 F.2d 443, 447 n. 7 (4th Cir. 1973):

> [W]hat constitutes a 'substantial disparity' depends in large part upon the mechanisms by which any disparity results. If the disparity proceeds from objective criteria, i.e., age, education attainment, registration to vote, etc., the 10% test of *Swain* may be safely employed. But if the disparity proceeds from the application of subjective tests, under which there is wide opportunity for intentional racial discrimination, the tolerable disparity is diminished.

It is clear that the disparity in Ford's case does not even reach the minimum level approved in *Swain.* Nevertheless, Ford argues that in his case evidence that the jury selection process was susceptible to abuse bolsters the inference of discrimination raised by the statistical evidence.

Ford contends that the manner in which the sheriff decided to serve the summons reduced the "random" nature of the procedure by which a jury venire was assembled. That is, the sheriff would on occasion, either by request or for some other reason, not serve the summons at all. For example, at the evidentiary hearing in *Miller v. Lockhart,*[19] Thomas Crosthwait, a former Mississippi County Sheriff, police officer and Arkansas State Trooper, stated that he knew of a farmer who had the sheriff handle the summonses for his farmhands whom he did not wish to excuse from work (M.T. 144).

There is no indication, however, that this procedure operated to disproportionately exclude African–Americans. Crosthwait, a white, testified that he handled the summons for his wife who did not want to be on jury duty (M.T. 143).

Ford further argues that the manner in which the circuit judge excused potential jurors enhanced the system's potential for bias. The circuit judge, at the pretrial, explained the manner in which the jury panel was selected for Ford's trial:

> Prior to the commencement of this trial the clerk and judge opened the master jury box and a total of three hundred and three names were drawn by random selection or lot from the master list to comprise the jury panel for the trial of this particular case. Those three hundred and three were summoned by mail. The jury summons used in Chickasawba District of Mississippi County is the same used throughout the Second Judicial Circuit, being a printed form, a fold-over card type, the first of [sic] half of tear off card consisting of the summons, the second half of the tear off card constituting a questionnaire [sic] which each summoned juror, upon receipt, is to complete, sign and return in the mail.

Tr. 202.

The jurors who received summons were given postcards, for return to the clerk of the court, on which to write general information such as name, address, occupation and any reason for excuse from jury service. Before trial and outside the presence of the attorneys, the circuit judge would review the jury cards with the clerk and unilaterally decide who he would excuse (Tr. 72–74; H.T. 195–97; 270–71). In Ford's case, the court granted eighty-eight excusals out of 303 summonses prior to trial (M.T. 141, 170).

There is no evidence that African–Americans were disproportionately excused. Rather, the percentage of African–Americans actually appearing at trials (after excusals) was greater than the percentage of African–Americans summoned (Ex. 46).

---

19. The transcript of the hearing in *Miller v. Lockhart,* No. PB–C–81–152, was made part of the record in this case. *Miller* involved the same judge and prosecutor. The trial took place in Crittenden County, also part of the Chickasawba District. References to testimony at the *Miller* evidentiary hearing are designated as M.T.

Furthermore, the Court is not persuaded that the circuit judge discriminated on the basis of race in the granting of excusals. He stated that he did not have any way of knowing the race or background of a prospective juror as the questionnaire did not contain that information (H.T. 270). *See Alexander v. Louisiana*, 405 U.S. 625, 627, 92 S.Ct. 1221, 1223–24, 31 L.Ed.2d 536 (1972) (questionnaires and information cards available to commissioners for selecting grand jury venire contained racial identification).

The Court notes that there is the possibility of potential for abuse here. As noted above, the method by which the summons were served and the excusals by the circuit judge might have resulted in a "progressive and disproportionate reduction of the number of" African–Americans eligible to serve. *See Alexander v. Louisiana*, 405 U.S. 625, 629, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536 (1972). *See also Duren v. Missouri*, 439 U.S. at 366–67, 99 S.Ct. at 669–70 (systematic exclusion of women in the jury selection process at both the jury wheel and summons stages; women comprised 54% of population, less than 30% summoned were female, 14.5% percent at the venire stage). However, as discussed above, the statistics and the evidence do not support that such abuse did occur, or that there was even a probability that it did occur.

The Court, therefore, finds that Ford has failed to establish a prima facie case of racial discrimination in the jury selection process. As such, the Court finds that Ford has not demonstrated that his right to a jury drawn from a fair cross section of the community was violated.

IV. For his fourth claim, Ford contends that he was denied a fair trial because the prosecutor exercised his peremptory challenges in a racially discriminatory manner.[20]

Under *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)

[A] defendant can make out a prima facie case of purposeful discrimination on proof that the prosecutor perverted the peremptory-challenge system by using his challenges 'to exclude blacks from the jury "for reasons wholly unrelated to the outcome of the particular case on trial," or to deny to blacks "the same right and opportunity to participate in the administration of justice enjoyed by the white population."'

*Garret v. Morris*, 815 F.2d 509, 511 (8th Cir.), *cert. denied*, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 191 (1987) (*quoting Batson v. Kentucky*, 476 U.S. 79, 90–92, 106 S.Ct. 1712, 1720, 90 L.Ed.2d 69 (1986)).

Inquiry into a prosecutor's reasons for exercising the challenges is not required under *Swain*, as the presumption exists that the prosecutor is using the challenges to obtain a fair and impartial jury. However, the presumption may be overcome by showing that the prosecution has systematically excluded African–Americans from petit juries over a period of time. *Id.*

Furthermore, while a prosecutor has no duty to justify his or her actions under *Swain*, when he or she volunteers the reasons for striking African–American jurors, the prosecutor is no longer "'cloaked by the presumption of correctness'" and the Court may review the prosecutor's motives "'to determine whether the purposes of the peremptory challenge are being perverted.'" *Garrett*, 815 F.2d at 513 (quoting *Weathersby v. Morris*, 708 F.2d 1493, 1496 (9th Cir.1983) (internal quote omitted). *See also Walton v. Caspari*, 916 F.2d 1352 (8th Cir.1990), *cert. denied*, 499 U.S. 931, 111 S.Ct. 1337, 113 L.Ed.2d 268 (1991) (applying *Garrett*; reasons for state's peremptories were pretexts for discrimination).

Seven of the forty jurors called at Ford's trial were African–American. The court excused two African–Americans for cause, and the State excused the remaining five through

---

**20.** In his second amended habeas petition Ford stated that his "6th, 8th and 14th Amendment Rights to have a Racially Unbiased, 'Representative Cross–Section of the Community' Hear his Case were Violated by the Prosecutor's Discriminatory Use of Peremptory Challenges." This argument, different than the one previously discussed, is analyzed on equal protection grounds and is governed by *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). *See Garrett v. Morris*, 815 F.2d 509, 511 n. 2 (8th Cir.1987).

the exercise of peremptory challenges (Tr. 670).

After defense counsel objected to the prosecutor's exclusion of two African-Americans, Mr. Turner and Mr. Smith, as alternates without any voir dire, the prosecutor, David Burnett, articulated his reasons for excluding African-American jurors.

Burnett stated as follows:

The reason I did it though was because I had just prior to them being called come to the clerk's bench and inquired of the clerk as to who the next series of jurors to be called were. I had checked them off of my master list. I identified several people on the jury that I knew and knew of and felt that they would be good, competent, proper jurors in the interest of the State. I knew nothing about the other two gentlemen called up here and had no knowledge of anything pertaining to them and I simply struck them because I knew that I had two or four more people in the event that they struck two that would be much more satisfactory in the eyes of the State having had personal knowledge of the attitudes and feelings of some of the others on the panel. (Tr. 664–665).

After Ford's counsel pointed out that Burnett was systematically excluding the jurors on the basis of race, Burnett continued:

I have not systematically excluded anyone from this jury. I have simply exercised my right to exercise peremptory challenges. I point out to you that my strategy failed in some regards in as much as the next prospective juror on the list, Mr. Billy Crosskno, was not present in the courtroom when his name was called. It was my desire to reach that particular juror who I knew to be a good, honest man and desired to have him as an alternate. (Tr. 665).

Burnett then explained why he used his peremptory challenges to excuse three African-Americans as jurors. He stated that he excused Ms. Talley, because of her responses to Burnett's questions. "I felt she was not strong on the issue of the death penalty."

The prosecutor also excused Mr. Billips, "an eighty-two year old man whose questions were vague and unresponsive and sometimes intelligent [sic] whom I also felt like was not literate. I didn't ask him but there was something he said that indicated to me that he couldn't read. I didn't embarrass the old man by asking him. I simply—"

The trial judge, in an effort to assist the prosecutor in justifying his actions, stated: "He indicated he had read nothing in the papers so he couldn't read—"

Picking up on that lead, Burnett stated with regard to Mr. Billips: "I didn't go back and ask him which would have been grounds for a cause strike but because he could not read the English language." (Tr. 671).

Burnett then challenged Ms. Parker, "the wife of judge Parker, not because she was black because the responses to her questions were fairly good as far as the State was concerned." Burnett continued,

I struck her because of an incident involving her husband's application through a lessor for retail beer permit at a club described and known as the Midway Club. This became a hot issue in the Burdet community, was strongly objected to by community leaders and in fact there were representations that lawsuits would be made because of the denial and Mr. Parker, her husband, was deeply involved in it, spoke to me on numerous occasions about it, spoke to other people about it and was very hot because I personally objected to the issuance of it. And I was not about to take a chance on her anger being spilled over into a case of this nature. And that's the reason I struck her. (Tr. 671–72).

It is clear that Burnett's exclusion of the two alternates cannot be on any other basis than race. He asked no questions, and knew nothing of the qualifications of the potential jurors. The only obvious information he had available to him was the color of their skin. There was nothing to indicate that the two African-Americans, Turner and Smith, would not be "good competent jurors." Indeed, the perfunctory manner in which Burnett treated the African-American alternates reveals that the "purposes of the

peremptory challenge are being perverted."[21]

■ The record further reflects that Talley, who was challenged because she was not "strong on the death penalty" did not indicate in any way that she could not impose the death penalty. Talley was among the first group of jurors called on the first day. Burnett's voir dire of Talley went as follows:

Burnett: Mrs. Talley, you have indicated to the Court that you don't have any fixed opinions, moral beliefs or scruples in opposition to the death penalty; is that correct?

Juror Talley: Yes, sir.

Mr. Burnett: All right. I take it then, ma'am, that you are telling me that you could and would impose the death penalty in a proper case and that you would have no objection against the death penalty if you felt it was warranted by the circumstances?

Juror Talley: Yes, sir.

Tr. 333–34.

There is nothing to indicate that Talley's response is "not good" on the death penalty. In fact, her response is stronger than whites who were not excluded.

Mr. Burnett: All right, Mr. Kelley, same question, sir, that I have asked the first six people selected in the jury. Do you have any opinions in opposition to the death penalty as a form of punishment by society?

Juror Kelley: As far as—I don't think so.

Mr. Burnett: I take it, Mr. Kelly, that you could and would based on the evidence that you heard from the witness stand in a case that you felt to be proper consider the death penalty?

Juror Kelley: Well, in certain circumstances, yes.

Tr. 335.

Mr. Burnett: ... Mrs. Singleton ... Do you have any opinions in opposition to the death penalty, whatever they might be?

Juror Singleton: No.

Mr. Burnett: The way you answered the question, you are thinking real hard about

it, I take it. And I want you to. It is real important.

Could you and would you in a proper case consider the imposition of the death penalty?

Juror Singleton: I would consider it.

Mr. Burnett: All right. Recognizing that you do have an option in the case, would it be easier for you and would you be more inclined to impose life without parole than the death penalty irregardless [sic] of the facts in the case?

Juror Singleton: It would depend on the facts. I would—

Mr. Burnett: [Interposing] You would consider the facts?

Juror Singleton: I wouldn't automatically choose life without parole or automatically choose death.

Tr. 336–37.

■ The voir dire of Billips reveals that there was no basis for Burnett's conclusion that Billips was either illiterate or that he could not read the English language. Burnett never asked Billips about his reading ability. Burnett's voir dire of Billips consisted of the following:

Mr. Burnett: Mr. Billips, sir. I've noticed you being responsive to some of the questions of the others and particularly on the death penalty. I think you gave me two different responses.

How do you feel about the death penalty, sir?

Juror Billips: I'm the same way.

Mr. Burnett: All right, how is that, sir? Are you for it or against it?

Juror Billips: I'm for it.

Mr. Burnett: You are for the death penalty in a proper case.

Juror Billips: Yes, sir.

Mr. Burnett: All right, sir. Do you have any opinions or beliefs in opposition of the death penalty at all?

Juror Billips: No.

Mr. Burnett: I take it what you are telling me is you can listen very carefully to the

---

**21.** In his concern to obtain two "competent, good [i.e. white] jurors," Burnett used two per-emptory challenges, although he was entitled to only one (H.T. 339–40; 359–60).

evidence that comes from this witness stand and not what I say or somebody says but what the witnesses say and render an opinion as to the guilt or innocence in the case and that you will consider what they have to say as going to the punishment?

Juror Billips: Yes, sir.

Mr. Burnett: All right, sir. And Mr. Billips, I notice you are eighty-two years of age. You can ask to be excused from this jury if you don't feel like serving or don't want to serve. Do you have such a feeling?

Juror Billips: No, I ain't tired.

Mr. Burnett: I think that answers my question pretty good. You could stay with us four or five days if it take it then?

Juror Billips: Yes, sir.

Tr. 339–40.

The only reference to Billips reading the newspaper was during the voir dire by defense counsel. Cook asked Billips if he had any knowledge of this trial before appearing in court.

Q: Yesterday was the first time you ever heard about it?

A: Yes, sir. Of course, I watch TV but I don't—I don't read the paper or nothing because I want to be—.

Tr. 431.

Billips's response is a far cry from a statement that he could not read. Indeed, his statement that he had not read anything in the paper about the case was no different than a number of white jurors. When the time came to exercise his peremptory challenges on the first day, Burnett struck two jurors—the only two African–Americans on the panel, Billips and Talley.

■ On the second day of voir dire, Burnett struck the one African–American panel member, Charity Parker. Parker's husband owned the community center at Osceola. During Cook's questioning of Parker, she stated that liquor is not sold at the community center. "We rent out to social groups, you know, singing, gospel singing, preaching; you want to picnic, preach, then you are welcome to do it." (Tr. 536). Burnett then questioned Parker further:

Q. Mrs. Parker, you are Judge Parker's wife, are you not?

A: Yes, I am.

Q. And he owns property in the Osceola district of Mississippi County?

A: Yes, sir.

Q: And part of that property is—you described it as the community center and it is also known as the Midway Club on highway 61?

A: It used to be but we turned it into— we converted it into a community center.

Q: Your husband made an application for a on premise liquor permit, did he not?

A: No, he never wanted liquor, no.

Q: All right. Did one of his lessees do it?

A: Yes, they did.

Q: That was denied by the State, was it not?

A: I don't know anything about that. The building was rented to them. I couldn't—you know, I don't know anything about that.

Q: Well, I know that that happened and what I'm asking you really is is there anything about that denial of that application for your husband or one of his lessees by the State that would cause you to have any ill will toward any law enforcement?

A: No, sir. You know, he got his building leased and I was always against it. And he just—and he rented the building out like I told you. He rented it to, I can't think of the name—

Q: Wells.

A: Oh, yes, that's right. And they tried to get a liquor license, you know.

Q: Well, I just wanted to know if there is anything about that that gave you a problem that—

A: [Interposing] No, I don't believe in that.

Mr. Burnett: Thank you.

Excuse.

Tr. 641–643.

At face value, Burnett's reason for excusing Parker might appear valid. However, when considered in light of the clearly pretextual reasons offered by Burnett for the

other jurors, even his rationale for excusing Parker cannot withstand scrutiny. Parker stated that both she and her husband disapproved of liquor, therefore, she would have approved of the state's role in denying the lessee a liquor license.

At the evidentiary hearing, Burnett discussed his use of peremptory challenges. He stated he was offended at Cook's allegation that he had deliberately exercised his peremptory challenges to exclude African-Americans from the jury (H.T. 321). However, he conceded that the reasons he had for excusing at least two African-American jurors "probably would not meet the test that's now required by the *Batson* decision ..." (H.T. 322).

"Despite the prosecutor's disclaimer of racial motives, it appears that he was in effect excluding the [African-Americans] from the petit jury in this case in the belief that, as [African-Americans], they were not qualified to serve as jurors in the trial of this [African-American] defendant." *Garrett,* 815 F.2d at 514.

Based on *Garrett* and *Walton* the Court finds that the prosecutor's use of peremptory challenges violated the equal protection clause.

■ Furthermore, the Court recently found that Burnett's systematic use of peremptory challenges violated the rights of Eddie Lee Miller, an African-American, tried in Crittenden County. *Miller v. Lockhart,* 861 F.Supp. 1425 (decided 1994). The Court quotes the applicable findings in *Miller* and finds that they support the conclusion in this case that the prosecutor consistently and systematically excluded African-Americans from participating as jurors through the use of peremptory challenges.

Miller argues that David Burnett, the prosecutor in his case, had a history of systematically excluding African-Americans as jurors through the use of peremptory challenges. Indeed, Ross, Miller's trial counsel was cognizant of Burnett's actions, and filed a "Motion to Restrict the

State from Striking All Blacks on Jury Panel" prior to trial. That motion was denied. During voir dire, when Ross objected to Burnett's use of his peremptories to strike five African-American jurors, Burnett stated "I am going to exercise my challenges in however I see fit."

The jury panel initially consisted of an overrepresentation of African-Americans. In fact, almost half the panel was African-American. However, Burnett used all ten of his peremptory challenges to strike African-American jurors, thereby leaving Miller with a jury comprised of nine whites and three African-Americans.[22]

Dr. Berry stated that due to the limited number of summoned jurors who actually appeared and the percentage of African-Americans on the panel, it was apparent that there would necessarily be some African-Americans on petitioner's jury. However, the jury selection process in Miller's case evinced a systematic decimation of African-Americans as potential jurors through the prosecutor's use of peremptory challenges. Dr. Berry noted that the lower incidence of African-Americans serving as jurors could not be explained as a result of random selection.

Based on his review of the cases which Burnett had prosecuted, Dr. Berry made the following observation:

We could add say the Miller case, the Ward case, and we could start piling case upon case upon case, and I think that the pattern that begins to emerge when you do that is that at those post peremptory stages, when the prosecution begins to exercise peremptory challenges, it doesn't seem to be based upon some kind of pattern of legitimate objections of potential bias. It seems to be based upon a pattern of what color is the potential juror's skin. If they are black, strike them. That is a consistent pattern that I think is obvious and visible beyond the Ford [Clay Anthony Ford] case.

A number of practicing attorneys testified to the prosecutor's systematic and consistent use of peremptory challenges to ex-

---

**22.** The prosecutor used nine of his peremptory challenges to strike African-Americans from the jury and his tenth to strike an African-American alternate juror.

clude African–Americans from juries. Bill Ross, Miller's attorney, had practiced law since 1968, and became a public defender for Mississippi County in September, 1974. He had participated in over fifty jury trials. When asked about his belief that the prosecutor would use his peremptory challenges against prospective African–American jurors, Ross testified as follows at the evidentiary hearing:

Q: Had you encountered this before in your practice?

A: Yes.

Q: Okay. Would you say you had encountered it often?

A: Yes.

Q: Was it done in all cases, or was it done more often in more serious cases?

A: I think it was done pretty well in most of the cases that I dealt with. I think they would normally, if they were going to exclude, they would exclude blacks from the jury. They just didn't feel that they would be as prosecution oriented I suppose. But they did exclude them with peremptory challenges.

.　　.　　.　　.　　.

Q: Had you experienced that through that time period [from 1968 through 1979]?

A: Yes.

Q: Are you aware of other attorneys that have voiced the same complaint.

A: Yes.

Ken Cook, a Crittenden County deputy public defender from January, 1980 to October, 1985, was personally aware of Burnett's reputation for systematically excusing African–American prospective jurors. He testified at the evidentiary hearing in the Clay Anthony Ford habeas case as follows:

Q: What are you referring to when you were saying it was pursuing the type of voir dire it always did pursue? Were you talking about striking blacks?

A: Yes

Q: That was a reputation of the prosecution, no doubt about that, isn't that true?

A: There was more than one prosecutor over there. David Burnett was the chief

or whatever they call the prosecutor but it was a fact of life in most cases.

Q: Particularly in murder cases?

A: With black defendants—

Q: Yes

A: —and a white victim.

He continued, "I think I heard [Burnett] deny that he intentionally struck blacks, but my experience was that that's exactly what he did."

In his fifth motion for summary judgment, petitioner submitted the affidavits of practicing attorneys. Oscar Fendler stated that he has been a licensed attorney since 1933, after graduating from Harvard Law School and has practiced law continuously in Blytheville except for four years when he was in the United States Navy. During his many years of practice, he had occasion to try criminal cases. He noted if an African–American made it to the jury panel, the prosecutor would use a peremptory strike to keep him or her off the jury. Samuel Turner, Jr., a member of the bar since April 4, 1975, stated that in his limited experience in criminal cases, he observed in one of the cases he tried, *State v. Ronald Ward*, the prosecutor using peremptory strikes to excuse all African–Americans from the jury.

Thomas G. Montgomery stated that he has practiced criminal law since 1974 and has been the Crittenden County Public Defender since December 1977. He stated: "During the period 1974 through 1985, there were several occasions when I have made objection at trial to the prosecution's exclusion of blacks from the jury through the use of peremptory challenges, as well as objections to the lack of black jurors appearing on the jury panel." Additional support is found in other cases where Burnett was the prosecutor. In *State v. Leroy Alexander*, tried on February 27, 1979, defense counsel objected to prosecutor Burnett's "systematic exclusion of blacks from the jury" and the state's use of all of its peremptory challenges to excuse black jurors.

In *State v. Clay Anthony Ford*, tried in May, 1981, Burnett used his peremptory

challenges to exclude the remaining five African–American jurors.

The Court is persuaded that Miller has established that the prosecutor consistently and systematically excluded African–Americans from participating as jurors through the use of peremptory challenges. Miller has presented evidence of a pattern of exclusion through the use of direct testimony and indirect statistical proof. Such is sufficient to meet his burden of establishing that his rights to equal protection were violated. *See Jones v. Davis*, 835 F.2d 835 (11th Cir.1988), *aff'd* 906 F.2d 552 (1990), *cert. denied*, [498 U.S. 1109] 111 S.Ct. 1019 [112 L.Ed.2d 1100] (1991) (defendant met burden by presenting testimony of six criminal attorneys who testified to having observed a pattern and practice on the part of the prosecutor to use peremptory challenges systematically to strike African–Americans from the jury venire.) Respondent has offered no evidence to refute or rebut petitioner's claim.

Op. at 1465–1467.

Similarly, the Court finds that Ford has established that the prosecutor has consistently and systematically excluded African–Americans from participating as jurors through the use of peremptory challenges. He has also established that the prosecutor's use of peremptory challenges in his case violated his rights to equal protection. Thus, the Court finds that both the conviction and the sentence are invalid and must be set aside.

■ V. For his fifth claim, Ford asserts that the prosecutor made numerous prejudicial and inflammatory statements during his closing arguments at both the guilt/innocence phase and penalty phase, making it impossi-

ble for Ford to receive a dispassionate verdict from the jury.

"The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)). The Court has reviewed the closing arguments.

The Court has reviewed the closing arguments. In a number of instances, particularly at the penalty phase, the prosecutor makes reference to Ford as a "misfit" and a "beast." [23] The Court cannot condone such remarks as proper or appropriate for the prosecutor to make.[24] However, the Court in this instance, after reviewing the record, finds that the prosecutor's statements were not so egregious as to deny Ford due process. The Court finds that Ford is not entitled to relief on this claim.

■ VI. Ford contends in the sixth ground that the admission of evidence relating to his prior convictions violated his constitutional rights by prejudicing the jury as to his character and background.

During closing argument at the guilt/innocence phase, the prosecutor referred to other crimes that consisted of "the escape, the burglary, the theft and possession of stolen property." (Tr. 1008). Defense counsel objected and moved for a mistrial. The prosecutor argued "[i]t is intended only to reflect that he was attempting to escape from the scene to avoid any prosecution for those items there."

> Clay Anthony Ford as a cold blooded thinking, calculating murderer that should get just exactly what he sowed. He illustrated in every regard the calculating nature of the beast that he is.
>
> Tr. 1188.

---

**23.** For example, the prosecutor, during closing argument at the penalty phase, stated the following:

> Well, if you do weigh the totality of the circumstances you will come to the cold, hard realization that a useful and productive member of society was killed by this stupid, senseless, totally irresponsible, unjustifiable, unmitigatable act of society's misfit.
>
> Tr. 1184.
>
> I submit to you again that unlike what Mr. Cook would have you believe I characterize

**24.** The Court, in *Miller v. Lockhart*, 861 F.Supp. 1425 (E.D.Ark.1994), a capital case tried by the same prosecutor, found the prosecutor's remarks during closing argument to be so egregious as to deny the petitioner due process.

The court denied the motion for mistrial and instructed the prosecutor not to dwell at length on the matter. The court found that the prosecutor "was referring to any motive or reason that the defendant might have for killing the officer besides arrest for speeding charge" (Tr. 1005).

The Court finds no error in the state's reference to the prior crimes during the penalty stage.

During the penalty stage, the prosecution introduced Ford's prior convictions for larceny, burglary, and receiving and concealing stolen property (Tr. 1071; Tr. Ex. 45). The trial court overruled Cook's objection to the introduction of this evidence but agreed to give an instruction limiting the consideration of the evidence to whether "the lack of any prior history of criminal convictions was a mitigating circumstance which should be considered by you in assessing punishment" (Tr. 1071).

The Arkansas Supreme Court found that the court erred in allowing evidence of these prior crimes as they did not involve the use or threat of violence or create substantial risk of death or serious physical injury to another person. Therefore, the prior convictions could not be used as an aggravating circumstance.[25] "Neither were these prior felonies proper for the purpose of anticipating a showing of lack of prior convictions as a mitigating circumstance." 276 Ark. at 110, 633 S.W.2d 3.

The Arkansas Supreme Court determined that the improper admission of the felonies was not prejudicial because the jury did not find that the aggravating circumstance of a prior violent felony. Justice Hickman, in a strong dissent, asserted that the use of the inadmissible prior convictions was prejudicial error. The mitigating circumstance of no significant history of prior criminal activity should not have been submitted to the jury in this instance, as the evidence did not support it. By doing so, the prosecutor was able "to get in through the back door what was clearly prohibited by the statute." *Hill v. Lockhart*, 824 F.Supp. at 1336.[26]

The Arkansas Supreme Court in *Miller v. State*, 269 Ark. 341, 354, 605 S.W.2d 430 (1980), *cert. denied* 450 U.S. 1035, 101 S.Ct. 1750, 68 L.Ed.2d 232 (1981) recognized the problem of submitting aggravating or mitigating circumstances completely unsupported by any evidence. The court admonished trial judges "to omit from submission any aggravating or mitigating circumstances that are completely unsupported by any evidence . . ."

Justice Marshall, joined by Justice Brennan, dissented in the denial of Ford's petition for writ of certiorari. *Ford v. Arkansas*, 459 U.S. 1022, 103 S.Ct. 389, 74 L.Ed.2d 389 (1982). The justices found the state's introduction of the three prior criminal convictions "injected an extraneous factor into the capital sentencing proceeding" and that Ford's "death sentence . . . must be set aside." 459 U.S. at 1023, 103 S.Ct. at 389.

> To be effective, restrictions on sentencing discretion must not only appear in a statute, they must also be enforced. Criteria set forth in a statute serve no purpose if prosecutors are free to ignore them.

459 U.S. at 1023, 103 S.Ct. at 390.

The Court cannot conclude that the submission of the prior felonies was not prejudi-

**25.** Aggravating circumstances are limited to:

> (1) the capital murder was committed by a person imprisoned as a result of a felony conviction; (2) the capital murder was committed by a person unlawfully at liberty after being sentenced to imprisonment as a result of a felony conviction; (3) the person previously committed another felony an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person; (4) the person in the commission of the capital murder knowingly created a great risk of death to a person other than the victim; (5) the capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody; (6) the capital murder was committed for pecuniary gain; or (7) the capital murder was committed for the purpose of disrupting or hindering the lawful exercise of any government or political function.
> Ark.Stat.Ann. § 41–1303 (Repl.1977) (recodified as amended Ark.Code Ann. § 5–4–604 (1994)).

**26.** In *Hill*, the Court found that the prosecutor's use of three prior non-violent felonies to rebut the mitigating circumstance of no prior criminal history constituted constitutional error. The Eighth Circuit did not address the issue on appeal. Slip. op. at 1451.

cial or harmful or did not have a substantial and injurious effect or influence on the jury's decision. *Brecht v. Abrahamson,* —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *See Ford,* 459 U.S. at 1023–24, 103 S.Ct. at 390 ("There is certainly no basis for concluding beyond a reasonable doubt that the jury would have sentenced petitioner to death had it not been informed of his prior convictions.") "The prejudicial effect of the introduction of felonies into the jury's deliberation during the penalty phase cannot be underestimated." *Hill,* 824 F.Supp. at 1336. The jury was provided additional, non-admissible evidence of Ford's criminal history, information which it could have factored in its weighing process. *See Williams v. State,* 274 Ark. 9, 12, 621 S.W.2d 686 (1981), *cert. denied,* 459 U.S. 1042, 103 S.Ct. 460, 74 L.Ed.2d 611 (1982) (court would not speculate as to what jury would do in death case if jury had found only two aggravating circumstances instead of three). Furthermore, the prejudicial effect is compounded by the failure of defense counsel to present relevant, compelling mitigating evidence.

As Justice Hickman commented:

Ford should pay for the crime he committed, but our system cannot allow him to pay a price that is not fairly set by an impartial jury considering only relevant evidence in an atmosphere devoid of passion and prejudice.

276 Ark. at 116, 633 S.W.2d 3.

In sum, the Court finds that the admission of Ford's prior convictions at the penalty phase was erroneous and that it had a substantial and injurious effect or influence on the jury's determination that Ford should receive the death penalty. Thus, Ford is entitled to relief on this claim, and his death sentence must be vacated.

VII. For his seventh claim, Ford asserts that his constitutional rights were violated by not sequestering the jury during the weekend before the penalty phase. The Arkansas Supreme Court denied this claim, finding that Ford had failed to demonstrate that he did not receive an impartial trial because of the failure to sequester the jury. *Cain v. Arkansas State Podiatry Examining Board,* 275 Ark. 100, 105, 628 S.W.2d 295 (1982).

Similarly, Ford has not presented any evidence here to demonstrate that he was prejudiced by the failure to sequester the jury. Thus, the Court finds that this claim is without merit and must be dismissed.

## CONCLUSION

The Court finds that counsel was ineffective at the penalty stage. The Court further finds that the prosecutor's use of peremptory challenges violated Ford's right to equal protection of the laws. The Court also finds that constitutional error occurred during the penalty phase when the prosecutor introduced evidence of three non-violent felonies.

The petition for writ of habeas corpus is granted. The Court vacates Ford's conviction and sentence and the State is directed to either retry Ford within 120 days or the writ of habeas corpus shall be issued and Ford will be released.

IT IS SO ORDERED.